Willie McNAIR, Petitioner,

v.

Donal CAMPBELL, Commissioner, Alabama Department of Corrections, Respondent.

Civil Action No. 98–T–915–S.

United States District Court, M.D. Alabama, Southern Division.

March 12, 2004.

1286

Randall S. Susskind, Cathleen I. Price, Equal Justice Initiative of Alabama, Montgomery, AL, for Plaintiff.

Beth Jackson Hughes, J. Clayton Crenshaw, Michelle R. Stephens, James Roy Houts, Attorney General's Office State of Alabama, Montgomery, AL, for Defendants.

## OPINION

MYRON H. THOMPSON, District Judge.

Petitioner Willie McNair brings this petition under 28 U.S.C.A. § 2254 for a writ of habeas corpus challenging his conviction in Alabama state court for the capital murder of Ella Foy Riley. Pursuant to Rule 8 of the Rules Governing § 2254 Cases, evidence was taken on several claims that had not been defaulted. Briefing by the parties followed, and McNair now maintains 14 separate grounds for relief.[1] For the reasons that follow, the court finds that McNair is entitled to relief on one ground: ineffective assistance of counsel during the penalty phase of his trial. On all other grounds, his petition is denied.

## I. PROCEDURAL BACKGROUND

The complicated procedural history of this case is concisely summarized in

---

1. McNair has abandoned five claims originally raised in his habeas-corpus petition: claims G, K, L, H, and P. Petitioner's Habeas Corpus Brief on the Merits, filed September 20, 2000 (doc. no. 88) (Pet'r Br.), at 155.

*McNair v. State,* 706 So.2d 828, 831–33 (Ala.Crim.App.1997). McNair was convicted on April 18, 1991, for the capital offense of murder committed during the commission or attempt of a robbery in the first degree. McNair was first sentenced on May 16, 1991, when the trial judge adopted the jury's majority recommendation that McNair be sentenced to death. The sentence was thrice remanded to the trial court for a proper sentencing order. On February 26, 1993, after the first remand, McNair was again sentenced to death after the trial judge rejected the new sentencing jury's recommendation of life without possibility of parole. Two remands later, the state trial court entered an acceptable sentencing order. The appeals court affirmed the conviction and sentence on January 21, 1994, *McNair v. State,* 653 So.2d 351 (Ala. Crim.App.1994), and the Alabama Supreme Court likewise affirmed on September 2, 1994, *Ex parte McNair,* 653 So.2d 353 (Ala.1994). The United States Supreme Court denied a certiorari petition on February 21, 1995. *McNair v. Alabama,* 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995).

McNair filed a petition for post-conviction review under Ala. R.Crim. P. 32 on July 5, 1995. The state trial court dismissed all but three claims as procedurally barred: (1) ineffective assistance of counsel; (2) withheld exculpatory evidence; and (3) racially-biased imposition of the death penalty. At the Rule 32 hearing, the court also allowed testimony concerning another of McNair's claims.[2] This claim was raised in McNair's second amended petition for Rule 32 relief and challenged his conviction on the ground that the jury considered extraneous evidence during its deliberations.[3] All of McNair's remaining claims were denied on November 13, 1995, and the state appellate court affirmed the denial on July 3, 1997. *McNair v. State,* 706 So.2d 828 (Ala.Crim. App.1997).

McNair filed the present § 2254 petition for writ of habeas corpus on August 18, 1998. This court determined that the case should proceed in two stages: in Stage I, the court determined which claims had been procedurally defaulted and which non-defaulted claims merited evidentiary hearings. *McNair v. Haley,* 97 F. Supp.2d 1270 (M.D.Ala.2000). Now, in Stage II, this court reaches the merits of the non-defaulted claims.

## II. LEGAL STANDARD

This court's review of claims adjudicated on the merits in state court is governed by § 2254(d), as modified in 1996 by the Anti–Terrorism and Effective Death Penalty Act (AEDPA). Relief from this court shall not be granted unless that adjudication:

"(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

"(2) resulted in a decision that was based on an unreasonable determination

---

**2.** Under the Alabama Rules of Criminal Procedure, a petitioner is entitled to an evidentiary hearing if his petition for post-conviction relief is granted. Ala. R.Crim. P. 32.9. "The court in its discretion may take evidence by affidavits, written interrogatories, or depositions, in lieu of an evidentiary hearing ... or the court may take some evidence by such means and other evidence in an evidentiary hearing." *Id.*

**3.** Rule 32 Hearing Transcript (Rule 32 Hr'g Tr.), at 59–60.

of the facts in light of the evidence presented in the State court proceeding."

28 U.S.C.A. § 2254(d). For claims that have not been adjudicated on the merits in state court, and are otherwise validly before the federal court for review, the court can make its own determination of the merits. *Williams v. Head,* 185 F.3d 1223, 1226 (11th Cir.1999); *Moore v. Gibson,* 195 F.3d 1152, 1163 (10th Cir.1999).

■ The Supreme Court recently clarified the applicable standards of review under § 2254(d) in *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The "clearly established law" requirement allows this court to grant a petition for habeas corpus only if the state court decision violates, or is an unreasonable application of, clearly established Supreme Court precedent. *Williams,* 529 U.S. at 412–13, 120 S.Ct. at 1523–24. A decision is "contrary to" clearly established law if "a state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently on a set of materially indistinguishable facts." *Id.* at 412, 120 S.Ct. at 1523. A decision is an "unreasonable application" of clearly established law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decision but unreasonably applies that principle to the facts of the prisoner's case." *Id.* In so holding, the *Williams* Court rejected the more deferential standard that an unreasonable application can occur only if all reasonable jurists would come to a conclusion different from that of the state court, and held the standard to be one of objective reasonability. *Id.* at 409, 120 S.Ct. at 1521; *see also McIntyre v. Williams,* 216 F.3d 1254, 1256 (11th Cir.2000). With

these standards in mind, the court turns to the 14 grounds on which McNair currently seeks relief.

## III. DISCUSSION

### A. *BATSON*

■ In McNair's first claim, he contends the exclusion of ten of the 11 African-American jurors through peremptory challenges by District Attorney Valeska violated his Fourteenth Amendment rights under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The right of a criminal defendant to be tried by a jury chosen free from racial discrimination has long been clearly established by the United States Supreme Court. *Batson,* 476 U.S. at 85, 106 S.Ct. at 1716; *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1879). McNair raised his *Batson* claim on direct appeal to the Alabama Court of Criminal Appeals, *McNair,* 653 So.2d at 323, and the Alabama Supreme Court, *Ex parte McNair,* 653 So.2d at 354–55. Both courts denied relief. Upon consideration of these decisions, and an independent review of the record, this court finds McNair is due no relief for the exclusion of these jurors.

■ In *Batson,* the United States Supreme Court outlined a three-step process for evaluating claims that a prosecutor used peremptory challenges in a manner violating the equal protection clause of the Fourteenth Amendment. First, the defendant must make a prima-facie showing that the prosecutor exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, if both parties meet their burdens under steps

one and two, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 96–98, 106 S.Ct. at 1722–24. However, once a prosecutor has offered a race-neutral explanation and the court has resolved the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima-facie case becomes moot. *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991).

 The trial judge never made a finding that McNair established a prima-facie case of race discrimination. *Ex Parte McNair*, 653 So.2d at 355. Nonetheless, he required the prosecutor to articulate his reasons for striking the 11 African–American jurors in question.[4] Those reasons were:

Juror McAllister: "not being in Henry County."[5]

Juror Boatwright: "based on information provided by Durrell Whiddon, assistant DA, . . . who knows everybody. This defendant [sic] Allen Boatwright has a misdemeanor in the past."[6]

Juror Marsh: "based on [assistant District Attorney Durell Whiddon] knowing him . . . his reputation in the community."[7]

Juror Kelley: "'unstable per family members,' that he was not a stable

individual in relationship, in his demeanor, appearance, or actions."[8]

Jurors Brackin, Rivers, Thomas, and Brady: all struck for being close to defendant's age.[9]

Juror Ford: "'many criminal violations and anti-law per LE (law enforcement).'"[10]

Juror Chitty: "[H]e was before the Court before. He said that his brother was recently convicted here."[11]

 A prosecutor meets his burden at the second stage of the *Batson* test by offering a merely plausible explanation for the strike. *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995). At issue in stage two is only the facial validity of the prosecutor's explanation, as the burden of proof remains on the defendant to prove intentional discrimination. *Id.* "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." *Id.* at 768, 115 S.Ct. at 1771. McNair does not argue that any of the government's explanations is facially invalid, and this court agrees. Thus, the government has met burden at this stage of the court's inquiry. Accordingly, as is usually the case with *Batson* challenges, the court turns to the ultimate question of discrimination, that is, whether the proffered reasons for any, or all, of the strikes were merely pretextual.

 In the final stage of the *Batson* analysis, "the decisive question will be

---

4. Juror Leonard, an African–American, was struck at trial for being too old, Trial Transcript (Trial Tr.), at 633, but McNair does not challenge the exclusion of Leonard in this petition.

5. Trial Tr. at 635.

6. *Id.* at 631.

7. *Id.* at 634.

8. *Id.* at 633.

9. *Id.* at 638–40.

10. *Id.* at 633.

11. *Id.* at 631.

whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Hernandez*, 500 U.S. at 365, 111 S.Ct. at 1869. This is a question of fact, of the sort given great deference on review. It is also a question which must be answered with an eye to the totality of circumstances of the jury-selection process. The strength of a criminal defendant's *Batson* claim will largely depend on the credibility of the prosecutor and, in turn, of his proffered explanations. *Id.* A pattern of dubious explanations will cast doubt on the entire process. So too may a reliance on facially neutral explanations that result in a disparate racial impact—although not conclusive, these "should be given appropriate weight in determining whether the prosecutor acted with a forbidden intent." *Id.* at 362, 111 S.Ct. at 1867. However, a court's conclusion about the totality of the circumstances is only one aspect of its analysis. "[T]he Federal Constitution is designed to ensure that a State does not use peremptory challenges to strike *any* black juror because of his race." *Batson*, 476 U.S. at 99 n. 22, 106 S.Ct. at 1724 n. 22 (emphasis added); *see also Powers v. Ohio*, 499 U.S. 400, 409, 111 S.Ct. 1364, 1369–70, 113 L.Ed.2d 411 (1991). In other words, even if McNair fails to present persuasive evidence that the jury-selection process was characterized by racial animus, he can still prevail if he can establish that the prosecutor struck any one juror because of his or her race. Establishing racially charged or otherwise constitutionally suspect circumstances overall will help McNair's argument, but it is not decisive.

1. McNair's Challenge to the Jury–Selection Process as a Whole

■ McNair advances three theories to cast doubt on the racial neutrality of the entire jury-selection process. First, he notes that the strikes of five jurors—Marsh, Ford, Boatwright, Kelley and McAllister—were based on notations on the strike sheet made by Assistant District Attorney Durrell Whiddon. McNair describes these notations as "vague and cursory hunches," made with full knowledge of each juror's race because Whiddon was initially a member of the venire and thus had occasion to learn the race of each potential juror.[12] Second, McNair questions the sincerity of the prosecutor's reasons for striking those African–American jurors who were not asked any questions during voir dire, much less questions that probed the reasons ultimately proffered by Valeska. Finally, McNair recounts what he describes as a "documented history of racially discriminatory peremptory challenges by the District Attorney's Office."[13]

■ Each of McNair's arguments has legal merit and, to varying degrees, casts doubt on the overall constitutional validity of the jury-selection process. None, though, is unequivocal. Courts have found that vague and unsupported assertions can, in light of surrounding circumstances, be found not credible grounds for striking a juror. *See, e.g., Bennett v. Collins*, 852 F.Supp. 570, 583 (E.D.Tex.1994). Whiddon's notes on the strike sheets are, in fact, vague. However, vagueness alone cannot shift the burden of proving that a race-neutral reason is pretextual from McNair. *Purkett*, 514 U.S. at 768, 115 S.Ct. at 1771.

Similarly, when a prosecutor fails to question African–American members of a venire, he misses an opportunity to develop race-neutral reasons for his strikes and

---

**12.** Pet'r Br. at 4 & n. 2.

**13.** Pet'r Br. at 7–9, 9 n. 5.

may subsequently be unable to rebut a prima-facie case of discrimination. *See, e.g., Morrison v. Jones,* 952 F.Supp. 729, 733 (M.D.Ala.1996) (finding the State had not rebutted the prima-facie case established by the exclusion of 20 of 21 African–American jurors where the prosecutor asked virtually no questions during voir dire, and the record contained no other evidence to rebut this prima-facie showing). The failure of the prosecutor to use voir dire to support his ultimate reasons for striking nine of the ten jurors challenged here is plain from the record and not disputed. Indeed, most, if not all, of these *Batson* challenges could have been resolved by one question to each juror during voir dire. However, McNair has not brought to the attention of the court any case in which the failure by a prosecutor to ask pertinent questions during voir dire, where legitimate, race-neutral reasons were subsequently proffered, was alone sufficient to justify an inference of discrimination.

Finally, the Eleventh Circuit has held that testimony documenting the informal practice of a district attorney's office can be sufficient to establish discriminatory intent and a *Batson* violation. *Cochran v. Herring,* 43 F.3d 1404, 1410 (11th Cir. 1995). McNair also cites to the court six cases since 1991 in which convictions won by this district attorney's office have been overturned on appeal for *Batson* violations.[14] However, past instances of discriminatory practices by a district attorney

are less persuasive than the direct evidence of discriminatory intent such as that held sufficient to establish the inference of discrimination in *Cochran. See* 43 F.3d at 1412 (noting evidence that district attorneys followed an informal policy of striking black jurors because of their race and testimony from the actual prosecutor that race played a factor in the exercise of peremptory challenges).

McNair's challenge to the prosecutor's credibility, and to the neutrality of the jury-selection process overall, is countered, significantly so, by the racial composition of the venire and the ultimate composition of the petit jury. Eighteen of 65 jurors (28%) originally seated in the venire for McNair's case were African–American. The prosecution struck 11 African–Americans from the venire, or 61% of all African–Americans in the venire. Ultimately, seven of the 12 jurors (58%) who sat on McNair's jury were African–American. By comparison, at least 30% of Henry County was African–American at the time of McNair's trial.[15] Considering these data, the Court of Criminal Appeals concluded that, "Although some of the State's explanations for its peremptory strikes may be suspect under other circumstances ... and despite the lack of 'meaningful' voir dire concerning the basis for the strikes ... we find no inference of racial discrimination because of the statistical evidence present in this case."[16] *McNair,* 653 So.2d at 323.

In light of all of these factors, this court cannot conclude that the Alabama state

---

14. Pet'r Br. at 8–9.

15. 1990 Census of Population and Housing, Summary Population and Housing Characteristics, Alabama. The state courts operated under the belief that somewhere between 33% and 40% of Henry County was African–American.

16. The Alabama Supreme Court affirmed the lower court's ruling after an intervening state supreme court decision held that racial discrimination could be shown even if a greater percentage of African–Americans sat on the jury than on the venire. *Ex Parte Thomas,* 659 So.2d 3, 9 (Ala.1994). In *Ex Parte McNair,* the court found the racial composition of the venire and jury were "not control-

courts either were clearly erroneous or unreasonably interpreted the law or facts by finding that a significant inference of an intent to discriminate in the overall process had not been established. This court's review of the record finds that factors weigh both for and against such an inference and that the state courts should not be found in error under the standards governing relief under § 2254(d).

### 2. McNair's Challenge to the Strikes of Individual Jurors

It remains possible that a *Batson* violation may be established on any one of the prosecutor's strikes of the African–American members of the venire. This court's review of the state courts' findings takes as correct their initial premise that McNair has not established that the jury-selection process was generally infected by racial bias; absent an underlying inference that the process was tainted, the court will assume that the state courts were generally reasonable to conclude in close cases, where the credibility of the prosecutor weighs most heavily, that the background circumstances of the selection process did not necessarily imply discrimination. With this as a starting point, the court now turns to McNair's ten, individual challenges offered in support of his *Batson* claim.

■■■ *James McAllister:* The race-neutral reason given by the State for juror McAllister's exclusion from the jury is a notation by Whiddon that McAllister was not from Henry County. The Alabama Supreme Court, without analysis, found

this to be a "legitimate nondiscriminatory reason." *Ex Parte McNair,* 653 So.2d at 357. The state court came to this conclusion in spite of clear facts in the record indicating that McAllister was, in fact, a resident of Henry County. Nonetheless, as to the question of discrimination, the state court's conclusion was neither unreasonable nor contrary to clearly established law.

At the beginning of voir dire, the entire venire was asked the following question by the court: "Has anyone on the panel not resided in Henry County, Alabama, for the previous twelve months?" [17] No member of the venire responded, leading to the unmistakable conclusion that all of the potential jurors had lived in Henry County for the last twelve months. The State now argues that what appears clear on its face is really not:

> "McAllister made a statement during voir dire which supports the prosecutor's offered reason for the strike. In identifying himself, McAllister stated the following: 'My name is James E. McAllister. I live at Route 3, Box 605. I work at Holiday Shores in Eufaula.' Tr. at 39. Since Eufaula is located in Barbour County, the prosecutor's reason for striking McAllister for not 'being in Henry County' is supported by the record.....' [18]

In fact, the prosecutor's reason is *not* supported by the record. Route 3, Box 605 is, indeed, in Henry County.

The record makes clear that District Attorney Valeska was presented with con-

---

ling" but negated a finding of disparate impact, and the court went on to find each of the State's proffered reasons legitimate. 653 So.2d at 356–58.

**17.** Trial Tr. at 56.

**18.** Respondent's Habeas Corpus Brief on the Merits, filed November 3, 2000 (doc. no. 91) (Resp't Br.), at 18.

tradictory evidence concerning McAllister's residence. On one hand he had the note from Assistant District Attorney Whiddon that McAllister was not "in Henry County"; on the other hand he had McAllister's own statement of his address, and silent affirmation during voir dire that he lived in the county. Valeska did nothing to resolve this contradiction. In fact, had questioning shown that McAllister was actually not a resident of the county, the district attorney could have struck McAllister for cause.[19] *See* 1975 Ala.Code § 12–16–60(a)(1).

This contradiction alone, however, does not establish by clear and convincing evidence that the state court's determination was unreasonable or contrary to federal law. If McAllister had been the only African–American in the venire, or if all other African–American jurors had been struck, a race-neutral reason otherwise unsupported by the record would provide strong evidence of intentional discrimination. For example, in *McClain v. Prunty*, 217 F.3d 1209, 1221–22 (9th Cir.2000), the Ninth Circuit Court of Appeals concluded that where two reasons given by the prosecutor to strike an African–American juror were objectively contrary to the facts, the trial court's determination that the defendant had not proven intentional discrimination was an unreasonable determination of the facts. But in *McClain*, all three prospective African–American jurors were removed from the venire by peremptory strikes, establishing an inference of purposeful discrimination that has not been comparably established here. 217 F.3d at 1224. Despite the fact that the proffered reason is factually incorrect, given the totality of the circumstances, the court cannot say that the state court determination was unreasonable or contrary to law. Accordingly, McNair is not entitled to a new trial based on the strike of juror McAllister.

■ *Allen Boatwright:* Juror Boatwright was struck from the venire because of a previous misdemeanor. McNair argues that this reason was pretextual because the district attorney earlier asked the venire if any of them, their families, or close friends had been prosecuted by the district attorney's office. When asking this question, the district attorney explicitly stated that he was not interested in misdemeanor convictions.[20] Noting that striking a juror for his past criminal history is race-neutral, and that a white juror was also struck by Valeska for his past criminal history,[21] the Alabama Supreme Court found that the apparent contradiction did not indicate a pretext for discrimination. *Ex Parte McNair*, 653 So.2d at 356.

■ The state court's decision was a reasonable one, supported by the law, and should not be overturned here on review. The State's explanation of the apparent contradiction is plausible and race-neutral.

19. In its brief, the State contends that McAllister was also struck on recommendation of Whiddon. The record does not support the argument that this was an additional reason for his strike. Whiddon indicated to Valeska that McAllister was not from Henry County, that is, Whiddon was the source of the contradiction. Whiddon did not provide other grounds for the strike. Even if McAllister was struck on Whiddon's recommendation, no mention is made in the transcript or now in the State's brief of the reasons for this recommendation.

20. Trial Tr. at 179.

21. The state court did not specify whether the white juror's past criminal history also consisted of only a misdemeanor offense.

The district attorney questioned venire members about prior prosecution by the district attorney's office to determine if there existed bias against the prosecutors. Indeed, by asking potential jurors not only about themselves, but family and friends, the question implies this broader meaning. Even if this conclusion is incorrect, the constitution requires racial neutrality, not consistency. Just because Valeska framed his question to specifically exclude misdemeanors does not preclude him from a later strike for the race-neutral reason of a prior criminal history. McNair has provided no evidence otherwise to show this reason to be pretextual.

■ *David Marsh:* Valeska struck juror Marsh from the venire based on information from Whiddon about Marsh's "reputation in the community." [22] The Alabama Supreme Court upheld this strike finding that Whiddon's "knowledge of Marsh's apparently bad reputation within the community" was a "legitimate nondiscriminatory" reason for removing Marsh. *Ex Parte McNair,* 653 So.2d at 357. McNair contends that this conclusion was unreasonable because the state court's finding that Marsh's reputation was "apparently bad" was not supported by any facts in the record.

■ This court finds the proffered reason to be a weak one, but not so unreasonable as to warrant a reversal of the state courts under § 2254. Were prosecutors allowed to circumvent the requirements of *Batson* by reliance on vague and unsubstantiated claims of reputation, constitutional protection of the jury-selection process would be eviscerated. But *Batson*

does not go so far as to require prosecutors to articulate a reason for the strike that would otherwise be sufficient to support a challenge for cause, or require them to develop a supporting evidentiary record. The burden to prove discrimination rests with McNair. In this case, the evidence supports the reasonable conclusion that Whiddon knew many individuals in Henry County and their reputations. The Alabama Supreme Court also found that Whiddon offered negative recommendations to both black and white members of the venire, and that McNair provided no factual evidence to show that these recommendations were pretextual. *Ex Parte McNair,* 653 So.2d at 357. All told, there is enough evidence here to prevent this court from disturbing the state court's conclusion about the Marsh strike.

■ *Scottie Kelley:* Juror Kelley was struck because "notes submitted by law enforcement" indicated that he was " 'unstable per family members' " and that "he was not a stable individual, in relationship in his demeanor, appearance, or actions." [23] The Alabama Supreme Court did not find a *Batson* violation here, concluding that a "juror's demeanor or attitude may be a racially neutral consideration." *Ex Parte McNair,* 653 So.2d at 357. McNair argues that this reason should be rejected because "there is no fact in the record that supports a finding that Mr. Kelley was unstable," and that "in light of the totality of facts and circumstances" the reason is "a mere pretext for discrimination." [24] This court disagrees.

McNair's argument incorrectly shifts the burden of proof to the State. The "ulti-

<hr/>

**22.** Trial Tr. at 634.

**23.** *Id.* at 633.

**24.** Pet'r Br. at 23–24.

mate burden of persuasion regarding racial motivation rests with, *and never shifts from,* the opponent of the strike." *Purkett,* 514 U.S. at 768, 115 S.Ct. at 1771 (emphasis added). Thus, it is not for the prosecutor to provide an evidentiary basis for his strike, but for McNair to establish that the reason is pretextual. As this court noted at the outset, the state court was reasonable in starting from the premise that McNair failed to establish, as a general matter, that the jury-selection process was infected by racial bias. Therefore, the state court was reasonable in concluding in the absence of evidence to the contrary that McNair did not meet his burden on the Kelley strike.

 *Barbara Brackin, Barbara Rivers, Diane Thomas, and Ronnie Brady:* These four potential jurors were struck from the venire because of their age; each was born in the 1960s and was close in age to McNair. The State found that age "may serve as a legitimate racially neutral reason for a peremptory strike." *Ex Parte McNair,* 653 So.2d at 357. McNair contends that age, though not necessarily indicative of racial intent, is a group-based justification that can only be assumed to be race-neutral if the State shows the stricken juror was indeed biased in the manner anticipated.[25]

In some situations, the court may be inclined to agree with McNair that a group-based strike, in the absence of other evidence to show prejudice, is suspicious. That situation does not exist here because McNair has not established a general inference of discriminatory intent in the selection process. Age, alone, is race-neutral. The burden remains upon McNair to show specifically that the use of age for the strike was pretextual.[26] It is uncontested that the prosecutor struck all members of the venire, African–American and white, who were born in the 1960s. McNair cannot prevail with a merely conclusory allegation that these strikes were pretextual, especially when Valeska treated jurors of all races identically. Given this record, the Alabama Supreme Court's finding was reasonable.

 *M.C. Ford:* Juror Ford was struck from the venire because the prosecutor had been informed that Ford had "many criminal law violations" and was "anti-law." [27] McNair, once again, challenges the evidentiary basis for this peremptory strike.[28] Because the reason is race-neutral, and the burden remains on McNair to prove that the proffered reason was pretextual, the Alabama Supreme Court came to a reasonable conclusion that McNair had not met his burden in establishing a *Batson* violation. Accordingly, this court will not disturb that conclusion here.

---

**25.** *Id.* at 25.

**26.** McNair's reliance on *United States v. Changco,* 1 F.3d 837 (9th Cir.1993), as authority for the proposition that any permissible group-based justification can pass constitutional muster only where the prosecutor has shown that the juror has assumed the bias of the group, overreads the import of the *Changco* holding. The part of the *Changco* decision McNair relies upon addresses specifically the English-speaking ability of jurors. That aspect of the decision merely restated the holding of *Hernandez,* 500 U.S. at 371,

111 S.Ct. at 1873, that English-speaking ability can be a race-neutral reason for a strike. *See Changco,* 1 F.3d at 840. The *Changco* court expressly did not address the question relevant for this inquiry—whether language (age) was being used as a pretext for race—because of an insufficient record.

**27.** Trial Tr. at 633.

**28.** Pet'r Br. at 27.

*Johnny Chitty:* Juror Chitty was struck from the venire because his brother had recently been convicted, Chitty listed the home of this same brother as his home address, and Whiddon knew and apparently raised concerns about him.[29] McNair concedes that the prosecutor developed the basis for this strike during voir dire and has produced no evidence to show that this otherwise race-neutral reason was pretextual.[30] This court has already found that the Alabama Supreme Court was reasonable in determining that there was no inference of racial discrimination in the jury-selection process in its entirety. The Alabama Supreme Court was further justified in crediting the prosecutor's reasons and rejecting McNair's argument that Chitty's strike was infected by implication from the entire process. Accordingly, this court will not disturb the state court's conclusion.

## B. EXTRANEOUS EVIDENCE DURING JURY DELIBERATION

The evidence shows that during jury deliberations in the guilt phase of McNair's trial, Les Davis, the jury foreman and a minister, brought a Christian Bible into the jury room, prayed aloud, read scripture, and led the jurors in prayer. McNair claims that because the Bible had not been admitted into the record, it was extraneous evidence and that its presence in the jury room deprived him of his Sixth Amendment right to a fair trial. After an Ala. R.Crim. P. 32 evidentiary hearing, the Court of Criminal Appeals found that McNair "failed to meet his burden of making a factual showing from which it could be reasonably concluded that the

jury might have been unlawfully influenced in arriving at its verdict." *McNair,* 706 So.2d at 838. McNair argues here that this decision was contrary to and an unreasonable application of federal law, as well as an unreasonable interpretation of the facts, invoking all three tests in § 2254(d)(1) and (2).

■ Before addressing the merits of this claim, the court will first discuss its procedural posture. The issue before this court now is whether the presence of the Bible in the jury room, along with jurors joining together in prayer during their deliberations, deprived McNair of his right to a fair trial under the Sixth Amendment to the United States Constitution. McNair argued to the state court that the "jury improperly considered and relied on extraneous evidence during its guilt phase deliberations *in violation of Alabama law.*"[31] The record is clear that the state court addressed McNair's claim under state-law principles. *McNair,* 706 So.2d at 835–838 (analyzing the question within the framework of *Ex parte Troha,* 462 So.2d 953 (Ala.1984), and *Roan v. State,* 225 Ala. 428, 143 So. 454 (Ala.1932)). Because McNair had an opportunity to raise the federal constitutional issue, but did not, it was procedurally defaulted. *See Duncan v. Henry,* 513 U.S. 364, 366, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995). Nonetheless, it is still properly before the court because the State has waived procedural default as a defense. *See Esslinger v. Davis,* 44 F.3d 1515, 1524 n. 32 (11th Cir.1995).

■ In its answer, identification of procedurally defaulted issues and briefs for both the prior Stage I determination of

---

**29.** Trial Tr. at 631–32.

**30.** Pet'r Br. at 27.

**31.** Pet'r Br. at 1 (emphasis added).

procedural defaults, and this Stage II determination on the merits of the non-defaulted claims, the State failed to identify the Sixth Amendment issue as procedurally defaulted. Failure to assert the defense of procedural default constitutes a waiver. *See id.* Indeed, the State has consistently argued the extraneous-evidence issue on its *federal* merits. Because of McNair's procedural default and the State's waiver, this federal constitutional claim is now properly before the court; it has been fully briefed by both parties and will be heard on the merits.[32]

■ Now, the court must ascertain the standard of review for a state-court decision based on state law, which did not address the presently valid federal constitutional claim. Under AEDPA, a federal court can grant habeas relief only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d). It is impossible to conclude that the state court in this instance unreasonably applied federal law when it, in fact, applied state law. The other two AEDPA tests, however, are not analytically foreclosed. Thus, this court will address (1) whether the state-court decision was "contrary to" federal law, that is, *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954) and *United States v. Martinez,* 14 F.3d 543

(11th Cir.1994), or (2) whether the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." With respect to the second test, the court accords the state-court factual determinations a presumption of correctness. 28 U.S.C.A. § 2254(e)(1) ("The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

■ Before reaching the merits, the court must also determine what evidence it may properly consider. The parties do not dispute that Jury Foreman Davis's testimony at the Rule 32 hearing is properly considered by this court. McNair also asks the court to consider the affidavits of three other jurors: Mamie Feggins, Mildred Pelham and Tony Thornton. These were not admitted into evidence at the Rule 32 hearing, but McNair contends that they should be considered by this court because "the state court relied upon them to deny relief."[33] This characterization of the state court's decision is not accurate. The court's analysis was based solely on the testimony of Davis; the only mention made by the Court of Criminal Appeals of the three affidavits was its conclusion that, "even if [the affidavits] had been admitted [by the trial court], [they] would not change or alter our decision." *McNair,* 706 So.2d at 838. Accordingly, in discussing the merits of this claim, this court relies upon Davis's Rule 32 testimony alone.

---

**32.** A court may raise the issue of procedural default *sua sponte;* this is appropriate where a significant federal interest exists in avoiding the merits of the claim. *Esslinger,* 44 F.3d at 1525–26; *see also Housel v. Head,* 238 F.3d 1289, 1294 n. 5 (11th Cir.2001). Because this is a matter of federal law, and because McNair is time-barred from seeking further

relief in state court, no significant federal interest exists to preclude review.

**33.** Pet'r Br. at 35 n. 11. McNair does not challenge here the trial judge's decision to exclude these affidavits at the Rule 32 hearing. That decision was within the court's discretion. *See* Ala. R.Crim. P. 32.9.

 It is clearly established law that extrinsic evidence, that is, evidence that does not "come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel," is presumptively prejudicial. *Turner v. Louisiana*, 379 U.S. 466, 473, 85 S.Ct. 546, 549, 13 L.Ed.2d 424 (1965); *see also Remmer*, 347 U.S. at 229, 74 S.Ct. at 451; *Martinez*, 14 F.3d at 550. "The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that [contact with the extrinsic evidence] was harmless." *Remmer*, 347 U.S. at 229, 74 S.Ct. at 451. In other words, McNair's burden is simply to show that extraneous evidence reached the jury. Then, a heavy burden shifts to the government to rebut the presumed prejudice. *See Martinez*, 14 F.3d at 550.

 A court must review the totality of the circumstances around the introduction of purportedly prejudicial evidence to determine its effect on the jurors. *Remmer v. United States*, 350 U.S. 377, 378, 76 S.Ct. 425, 426, 100 L.Ed. 435 (1956). The Eleventh Circuit has identified several factors relevant to this analysis, "including the heavy burden on the government, the nature of the extrinsic information, the manner in which the information reached the jury, and the strength of the government's case." *Martinez*, 14 F.3d at 550; *see also United States v. Rowe*, 906 F.2d 654, 657 (11th Cir.1990).

The only evidence presented by either party on this issue was the testimony of Davis at the Rule 32 hearing. On direct examination, Davis readily admitted that he brought his pocket Bible into the jury room and that he read from that Bible to the other jurors.

"Q: [A]fter you heard all the evidence in the case, after the evidence was presented and the lawyers made arguments and you went back to deliberate, did you have your Bible with you then?

"A: Yes, I did.

"Q: Did you read from the Bible?

"A: Yes.

"Q: Did you read out loud?

"A: Yes.

"Q: Were the other jurors listening to what you were reading?

"A: Yes.

"Q: Did reading the Bible help you decide whether Willie McNair was guilty or not?

"A: Yes." [34]

Davis specifically remembered reading out loud two passages: Luke 6:37 and Psalm 121. Luke 6:37 (King James) provides: "Judge not, and ye shall not be judged: condemn not, and ye shall not be condemned: forgive and ye shall be forgiven...." Psalm 121 (King James) provides:

"I will lift up mine eyes unto the hills, from whence cometh my help.

"My help cometh from that Lord, which made heaven and earth.

"He will not suffer thy foot to be moved: he that keepeth thee will not slumber.

"Behold, he that keepeth Israel shall neither slumber nor sleep.

"The Lord is thy keeper: the Lord is thy shade upon thy right hand.

"The sun shall not smite thee by day, nor the moon by night.

---

**34.** Rule 32 Hr'g Tr. at 63.

"The Lord shall preserve thee from all evil: he shall preserve thy soul.

"The Lord shall preserve thy going out and thy coming in from this time forth, and even from evermore."

Davis noted that he read other passages as well.[35] These other passages were never identified.

Davis's testimony makes clear that he and at least some of the other jurors relied upon the Bible in their deliberations.

"Well, like I said again, after we heard both testimonies, both sides, you know, then we prayed. And, like I said, we prayed. And, you know, the only thing in the testimony and the prayer was the binding tie, you know, mixture. And we came up with the decisions. I mean it had a lot to do with praying, and a lot to do with what we heard." [36]

 In light of the heavy burden on the State to prove that the use of the Bible by the jury was harmless to McNair, the state court's failure to find harm here may have been an unreasonable application of federal law. The State introduced no evidence to rebut the presumption that, given the totality of the circumstances, consideration of the Bible did not improperly influence the jurors. It remains uncontested that Davis read the Bible aloud in the jury room and led others in prayer during their deliberations. It also remains uncontested that this evidence was not properly before the jury. And, most significantly, it remains uncontested that the Bible "helped" Davis "decide whether Willie McNair was guilty or not." [37] The state court's finding

that McNair "failed to meet his burden of making a factual showing from which it could be reasonably concluded that the jury might have been unlawfully influenced in arriving at its verdict," *McNair*, 706 So.2d at 838, altogether ignores the presumption of prejudice that exists in federal law. However, as noted earlier, the state court did not apply federal law; therefore, the court will not focus on the reasonableness of the state court's application of federal law. Rather, this court's inquiry must focus on the state court's result. Under § 2254(d)(1), the precise question before the court is whether McNair has shown, by clear and convincing evidence, that the result reached by the state court was contrary to the result that would have been reached under clearly established federal law. The court cannot say he has. Understandably, McNair's claim started from a weaker position in state court because the state court did not find the presumption of prejudice at the outset of its analysis that a court properly applying federal law would have found; under Alabama law, no such presumption exists, for a new trial is warranted if, simply, "the misconduct *might* have unlawfully influenced the verdict." *Ex Parte Troha*, 462 So.2d at 954 (emphasis in original). But the totality of circumstances, of which the heavy burden against the State is a significant but not exclusive element, do not weigh clearly and convincingly in McNair's favor.

In this case, the evidence did not have the imprimatur of the state court, that is, the court did not approve of its use.[38] The facts of the case were not seriously disput-

35. *Id.* at 78.

36. *Id.* at 79.

37. *Id.* at 63.

38. On this point, *Jones v. Kemp,* 706 F.Supp. 1534, 1559 (S.D.Ga.1989), is distinguishable. Habeas relief was granted in that case where the court gave permission for jurors to bring the Bible into the jury room.

ed and the evidence against McNair was overwhelming. Also there is no evidence before this court, other than Davis's testimony, that any jurors were actually influenced by Davis's Bible reading. By way of comparison, the court in *Martinez*—a case not governed by AEDPA—found a reasonable probability of prejudice on a record which included testimony by other jurors about the specific effects of extraneous evidence on their deliberations. 14 F.3d at 550–51. That court found that extraneous evidence led to "an atmosphere of coercion ... during the jury's deliberations." *Id.* at 552. The present record is far too thin, and lacks crucial information about the effect of the extraneous evidence, for this court to conclude that the decision violated clearly established law.

 This court also cannot find by clear and convincing evidence that the state court made an unreasonable determination of the facts under § 2254(d)(2). The state court's "inescapable" conclusion about the effect of the Bible and prayer on the jurors—that the jury did not do "anything other than base its verdict on the evidence presented in open court in the trial of the case," 706 So.2d at 838—does demonstrate a remarkable lack of appreciation for the complexity and diversity of religious beliefs. Lacking evidence of the actual effect of the cited Bible passages on the jurors, the state court substituted its own religious interpretation of these passages for that of each member of the jury. Davis's admission that he read other pas-

sages—which could just as well have been of the "vengeful" sort—only compounds the potential for error in the state court's undertaking.

But without clear and convincing evidence that the readings *contradicted* the court's instructions or the law as it was to be applied in this case, this court cannot find the state court came to an unreasonable determination of the facts under § 2254(d)(2). Accordingly, the court concludes that habeas relief is due to be denied on this claim.[39]

## C. INEFFECTIVE ASSISTANCE OF COUNSEL—PENALTY PHASE

McNair's third claim challenges the effectiveness of his legal representation during the penalty phase of his trial.[40] Under the authority of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and *Williams*, 529 U.S. at 412, 120 S.Ct. at 1523, McNair argues that his rights under the Sixth Amendment were violated by defense counsel's unreasonable and prejudicial failure to introduce mitigating evidence in the form of (1) expert testimony describing his crack-cocaine addiction; and (2) additional character testimony from family and friends. The procedural history of McNair's ineffective-assistance-of-counsel claim has a significant bearing on the merits currently before this court; accordingly, this discussion begins with a summary of background relevant to the claim.

---

**39.** The court must candidly state that it remains troubled by the extraneous-evidence claim. Therefore, if there is an appeal by either party from this judgment, the court hopes that this issue will be included in the appeal, either by McNair as a part of his direct appeal or by him as part of a cross-

appeal should the State appeal, so that the appellate court can revisit the issue.

**40.** In his sixth claim, McNair argues ineffective assistance of counsel during the guilt phase of his trial. That claim is addressed separately below.

### 1. Procedural History

McNair was first sentenced on May 16, 1991, when the trial judge adopted a jury's 10–to–2 recommendation that McNair be sentenced to death. After finding that improper evidence was admitted at sentencing, the Court of Criminal Appeals remanded the case for resentencing. *McNair v. State,* 653 So.2d 320, 329 (Ala. Crim.App.1992). A second sentencing jury was empaneled in Montgomery County after change of venue was granted.

At the second sentencing hearing, trial counsel for McNair called seven witnesses: Moses Knight, football coach for Abbeville High School; Barbara Fields, then-current guidance counselor of Abbeville High School; Bruce Starling, Chief Jailer for the Henry County Sheriff's Office; Robert Anderson and Simon Griffith,[41] two of McNair's former employers; Annie Glanton, McNair's mother; and Andrew Williams, McNair's uncle.[42] Knight testified that McNair was a quiet and agreeable student in school but admitted that he had not seen or had any dealings with McNair since he was expelled in the early 1980s.[43] Fields testified and relied on McNair's high school records; she had been employed at Abbeville High School for only two and a half years at that point and had no personal knowledge of McNair.[44]

Both employers testified in general terms that McNair was a good employee. Anderson testified that he had not seen McNair since 1986.[45] Griffith noted that McNair was once fired for arguing with a supervisor but was eventually rehired. Griffith also testified that, in the period directly before McNair was arrested for Riley's murder, he regularly asked for advances on his paycheck.[46] Neither was asked about knowledge or suspicions they may have had about McNair's use of drugs.

McNair's mother, Annie Glanton, did testify about McNair's drug use, explaining that she first became aware that he was on drugs when he was expelled from high school. She also testified that she believed his drug use continued until the murder of Riley. Shortly before he committed this crime, Glanton attempted to get McNair into drug-treatment programs but could not because McNair did not have

**41.** Griffith is referred to as Simeon Griffin in the transcript of the first sentencing and Simion Griffith in the transcript of the second sentencing hearing and in petitioner's brief. The court follows the name used by McNair for the sake of clarity.

**42.** The testimony presented at the second hearing was substantially similar to that presented at the first. During the first sentencing hearing, McNair's trial counsel put on seven witnesses: Knight; Starling; Glanton; Andrew Williams; Wiley Smith, then-current principal of Abbeville High School; and two former employers, Tommy Williams from Champion International and Simon Griffith from Franklin Hardwood. The only two witnesses at the second hearing who were different from those at the first were Wiley Smith and Tommy Williams. Smith, like Fields, testified from school records and had no personal knowledge of McNair. Tommy Williams introduced McNair's personnel record and testified that McNair was fired for fighting with co-workers. Trial Tr. at 1812. On the issues material to this claim—expert testimony about drug addiction and the effect the drug addiction had on McNair—there is no material difference between the two sets of witnesses.

**43.** Resentencing Trial Transcript, at 539.

**44.** *Id.* at 551.

**45.** *Id.* at 545.

**46.** *Id.* at 565–66.

insurance and she did not have money for treatment.[47] Williams testified that on the evening before Riley's murder, he found McNair with a butcher knife acting as if he was going to kill himself. Williams was aware of McNair's drug problem and testified that he occasionally lent him money.[48]

Based on this evidence, the second sentencing jury returned an 8–to–4 recommendation that McNair be sentenced to life without parole. Nonetheless, the state trial judge, who also presided over the guilt phase and initial sentencing, rejected the jury recommendation and again sentenced McNair to death.

The second sentencing order was reversed and remanded twice. The first remand ordered the state trial court to reconsider its finding of the aggravating circumstance that the event was "especially heinous, atrocious, or cruel," and to provide a specific written finding regarding the mitigating circumstance that defendant had no significant prior criminal history. *McNair v. State*, 653 So.2d 343, 347 (Ala.Crim.App.1993). The second remand issued five instructions to the lower court: (1) to examine and reconsider whether death was the correct sentence and whether the jury recommendation should be rejected; (2) to reweigh the aggravating and mitigating circumstances; (3) to enter a new, independent, self-sufficient sentencing order; (4) to set forth in writing specific findings as to each statutory and non-statutory aggravating and mitigating circumstance; and (5) to state reasons why any aggravating circum-

stance or circumstances outweighed any mitigating circumstance or circumstances. *McNair v. State*, ·653 So.2d 347, 350–51 (Ala.Crim.App.1993). On the third appeal, the Alabama Court of Criminal Appeals affirmed the conviction and sentence, *McNair*, 653 So.2d at 361–62, and the Alabama Supreme Court subsequently affirmed it as well, *Ex parte McNair*, 653 So.2d at 359–60.

McNair filed a petition for post-conviction review under Ala. R.Crim. P. 32 and an evidentiary hearing was held on his ineffective-assistance-of-counsel claims, among others. Nevertheless, attorneys for McNair did not produce any witnesses or other evidence on the ineffective-assistance-of-counsel claims. Accordingly, the trial judge rejected these claims, and was affirmed by the Court of Criminal Appeals, which noted that McNair "has continued to halfheartedly assert his claim of ineffective counsel before this court." [49] *McNair*, 706 So.2d at 840.

McNair raised ineffective-assistance-of-counsel claims in his habeas-corpus petition to this court and again requested an evidentiary hearing. The State did not object to the magistrate judge's recommendation that the claim had not been defaulted but did object to her recommendation allowing an evidentiary hearing. Upon consideration of recommendations of the magistrate judge, this court found that § 2254(e)(2), as modified by AEDPA, allowed for a hearing to develop evidence. *McNair*, 97 F.Supp.2d at 1279–80 (finding that petitioner's failure to develop evidence

---

47. *Id.* at 567–71.

48. *Id.* at 575–78.

49. In particular, the court noted that McNair's deficiencies included his failure to "identify any of the witnesses he claims would

have testified· about his alleged alcohol and drug abuse" or "demonstrate that there was a reasonable probability that an expert would have assisted his defense." *McNair,* 706 So.2d at 841.

on his ineffective-assistance-of-counsel claim in state court should not be attributed to him because "the state court had foreclosed the petitioner's attempts to develop the requisite expert testimony").

### 2. Evidentiary Hearing

At this court's evidentiary hearing, McNair presented 11 witnesses: two lawyers, two experts, and seven individuals who were either family members or personally acquainted with McNair. The State presented an expert of its own and a lawyer from the firm of one of McNair's trial counsel. The lawyers who testified for McNair—J. Earl Smith and Charles Decker—were his court-appointed counsel during the guilt and penalty phases of the trial. Smith has been a member of the Alabama Bar since 1964 and at the time of the trial devoted about 30% of his time to criminal practice. Decker had been practicing law for less than five years when he was appointed to McNair's case and, at the time of the trial, also devoted approximately 30% of his time to criminal cases. Smith, by state law, was first chair because of Decker's limited experience. 1975 Ala.Code § 13A–5–54. Decker, however, conducted almost all the pretrial investigation, prepared and drafted motions, and was the primary contact with the District Attorney's Office.

Despite having primary responsibility for developing the case, Decker testified that he felt his firm prevented him from devoting the amount of time he believed necessary to adequately represent McNair. He claimed the constraint was financial.[50]

"At the time I wasn't able to do the things that I would normally have done for Mr. McNair that I felt were necessary, because the firm prevented me from doing it. An example would be if I needed to go see him, he was in the county jail in Henry County, that's a thirty minute drive one way, that's an hour away from the office. Not to mention the time that I had to spend with him. I could not make a regular trip to see him. It wasn't like [walking across] the street to go to the Houston County Jail. You know, I was limited in the time I could spend with him to discuss the case with him." [51]

Despite Decker's claims, Jere Segrest, a partner in Decker's firm, denied that he ever put pressure on Decker to devote less time to McNair's case.[52] Segrest also made clear, however, that in light of this low statutory compensation and the firm's emphasis on civil work, Decker's work on criminal cases was not encouraged.[53]

Smith testified that at the time, there was nothing that Decker could have or should have done differently under the circumstances.[54] Decker, though, was critical of his own ability to represent McNair:

"Q: So did you or did you not adequately represent your client?

---

**50.** Decker and Smith were being compensated under the Alabama rules for compensation of appointed counsel, which authorized a maximum of $1000 for out-of-court time. 1975 Ala.Code § 15–12–21(d) (1990) (amended 1999); *see also Ex Parte Grayson,* 479 So.2d 76, 79 (Ala.1985). Decker testified that he stopped counting hours spent on the case after 200 and that his regular compensation rate at the time was $85 an hour. Evidentiary Hearing Transcript, Volume I (Evid. Hr'g Tr. Vol. I), at 30.

**51.** Evid. Hr'g Tr. Vol I, at 31–32.

**52.** Evidentiary Hearing Transcript, Volume II (Evid. Hr'g Tr. Vol. II), at 20–22.

**53.** *Id.* at 19.

**54.** Evid. Hr'g Tr. Vol. I, at 20–21.

"A: I don't think so.... I've handled more capital murder cases than any other lawyer in Houston County right now ... [and] I have been able to do far more in cases than I was able to do for Mr. McNair.

. . . .

"Q: Do you feel that you violated any of your ethical obligations under the Alabama Supreme Court rules in failing to adequately represent your client?

"A: Not intentionally.

"Q: Not intentionally, but unintentionally?

"A: It's quite possible because of the constraints that were placed on me by my firm that I was not able to do what Mr. McNair wanted me to do because of what Mr. Segrest was doing to me." [55]

One area in which Decker neglected to perform a follow-up investigation was McNair's addiction to crack.[56] At sentencing, testimony from McNair's mother and uncle mentioned his use of drugs at the time of the crime, but neither described changes in his behavior nor could they testify as to the medical aspects of McNair's condition. Decker claimed that because of a lack of funds, he could not "check into [McNair's] background concerning his drug use.... We had to rely on what information was provided to us from the Sheriff's office in that regard." [57] Decker further testified that having more resources—time and money—would have enabled him to devote more time to McNair's case, identify and call expert wit-

nesses to testify about McNair's drug problem, and expand on the character evidence presented at the penalty phase.[58]

Both of McNair's experts at the hearing addressed the medical and behavioral aspects of McNair's addiction to crack-cocaine. Dr. Alexander Morton, a psychiatric pharmacist with experience treating individuals with substance-abuse problems, testified generally about the biological effects of crack-cocaine, and in particular about the effects of crack addiction on McNair. Dr. Morton explained the cravings for crack that an addict, like McNair, would experience and the possible biological changes in brain chemistry that would affect the behavior of an addict and prevent him from being able to control his drug use.

"That is what a crack addict would think about, how to get the drug. That's probably all they would be able to think about.... [A] lot of people see this as a voluntary action when it's really a biological brain disease of craving and compulsive use.... [Crack addicts will] do whatever they need to in order to get the drug. Impulsive behavior." [59]

After interviewing McNair and members of his family, and reviewing court records, Dr. Morton concluded that McNair, at the time of the murder, exhibited behavior consistent with "classic cocaine addiction." [60] After conducting a psychological and forensic examination, Dr. Randolph Waid, an expert in clinical psychology, agreed with Dr. Morton's assessment of McNair. Dr. Waid described McNair's

**55.** *Id.* at 46.

**56.** *Id.* at 34.

**57.** *Id.*

**58.** *Id.* at 45.

**59.** *Id.* at 100.

**60.** *Id.* at 107.

adult life as a downward spiral of drug addiction, beginning with atypical personal behavior and work problems and leading to the commission of petty crimes to obtain money for more drugs.[61] Dr. Waid offered his expert opinion of McNair's behavior on the night in question, noting that McNair initially approached Riley with the intent to borrow money from her in order to procure crack, but that once he realized she would not lend it to him and that he would be blocked from his goal, his intent changed to robbery; his goal of obtaining crack, however, remained central throughout and motivated his behavior. Dr. Waid noted that the changed intent of McNair was "one of those impulsive, irrational, not well thought out things.... I don't think he had a predetermined plan in any way to be vicious and violent in his behavior."[62]

McNair's remaining witnesses—family and friends—offered testimony at the evidentiary hearing that was, in part, duplicative of testimony given by Glanton and Williams at the first and second sentencings about McNair's upbringing and personality before his involvement with drugs. New character testimony, however, corroborated the expert testimony regarding McNair's change from a pleasant pre-addiction person to a person who increasingly isolated himself socially,[63] lost weight,[64] and became a petty thief. McNair's aunt, Margie Warren, with whom he lived for one year in Florida, testified that while McNair lived with her he was more nervous than she had known him to be previously,[65] that he sold his house furniture because of his drug habit,[66] and that he was eventually arrested for stealing a purse.[67] McNair subsequently moved back to Alabama, where he again stole a purse.[68] The hearing testimony was significant and differed from that at sentencing because it also corroborated how an addiction to crack-cocaine changed a generally pleasant person, free of criminal activity, into a person whose actions were often motivated by his biological need for crack.

The State's expert in rebuttal, Dr. Kirkland, testified that it was his opinion that McNair knew right from wrong at the time of the murder. It was Dr. Kirkland's conclusion that McNair was coming down from a crack-cocaine high when he committed the murder.[69] He found it significant that McNair had a complete memory of his behavior during the offense, which indicated an "awareness of criminality."[70] McNair's awareness of the criminality of his behavior was not precisely addressed by either Drs. Morton or Waid. To the extent that McNair's expert testimony leads to the conclusion that his acts were irrational, though, it contradicts Dr. Kirkland's opinion that the act exhibited the "elements of rational planning."[71] Dr. Kirkland did not address medical aspects of crack-cocaine addiction, or their specific manifestation in McNair's case.

**61.** *Id.* at 136–40.

**62.** *Id.* at 146–47.

**63.** *E.g., id.* at 77.

**64.** *Id.* at 170.

**65.** *Id.* at 177.

**66.** *Id.* at 178

**67.** *Id.* at 76.

**68.** *Id.* at 76–77.

**69.** Evid. Hr'g Tr. Vol. II, at 14.

**70.** *Id.*

**71.** *Id.* at 14–15.

### 3. *Strickland* Analysis

■ No Alabama court has ruled on the merits of this claim with the evidence currently before this court. Therefore, this court does not have before it an adjudication on the merits by a state court, is not constrained by § 2254(d), and reviews this claim independently. For the reasons that follow, this court finds that the representation McNair received during sentencing was constitutionally ineffective.

■ For McNair to succeed on an ineffective-assistance-of-counsel claim he must show two things: (1) that the performance of his counsel fell below the standard of a reasonably competent attorney; and (2) that this deficient performance prejudiced his defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *Williams,* 529 U.S. at 390, 120 S.Ct. at 1511; *Chandler v. United States,* 218 F.3d 1305, 1312–13 (11th Cir. 2000) (en banc). The Eleventh Circuit has set forth a framework for evaluating claims involving a failure to present mitigating evidence at sentencing. First, "it must be determined whether a *reasonable investigation* should have uncovered such mitigating evidence." *Blanco v. Singletary,* 943 F.2d 1477, 1500 (11th Cir.1991) (quoting *Middleton v. Dugger,* 849 F.2d 491, 493 (11th Cir.1988)). If so, then the court must determine "whether the failure to put this evidence before the jury was a *tactical choice* by trial counsel." *Id.* Furthermore, if it was a tactical choice by counsel, the "choice must be given a strong presumption of correctness, and the inquiry is generally at an end." *Id.* Finally, "it must be determined that defendant suffered *actual prejudice* due to the ineffec-

tiveness of his trial counsel before relief will be granted." *Id.*

#### a. Performance

■ *Whether a Reasonable Investigation Should Have Uncovered the Mitigating Evidence:* Where the petitioner alleges that the failure to produce mitigating evidence constituted deficient performance of counsel, a petitioner must demonstrate that a reasonable investigation should have uncovered the mitigating evidence. *Blanco,* 943 F.2d at 1500. Furthermore, when the mitigating evidence in question includes expert testimony, a petitioner must show a "reasonable likelihood that an ordinarily competent attorney conducting a reasonable investigation would have found an expert similar to the one eventually produced." *Elledge v. Dugger,* 823 F.2d 1439, 1446 (11th Cir.1987). The court finds that the proposed testimony of friends and family, as well as the expert testimony, could have been procured with reasonable investigation prior to sentencing. Testimony about the effects of drug addiction, though important, was not so unique as to be unknown to the reasonably competent criminal-defense lawyer in Alabama in 1990–1991. Both Smith and Decker testified that they were aware of such expert testimony during their trial preparation, and Decker testified he would have called this type of witness.[72] Dr. Morton testified that research into the addictive effects of crack-cocaine was available as far back as the mid–1980s.[73] In addition, Drs. Morton and Waid both stated that they would have been available to testify at the time of trial.[74] Based on this evidence, the court concludes that the ex-

---

72. Evid. Hr'g Tr. Vol. I, at 19, 40–41.

73. *Id.* at 108.

74. *Id.* at 108, 167

pert testimony similar to that presented at the evidentiary hearing would have been found through a reasonable investigation by an ordinarily competent attorney in 1990 and 1991.

■■■■■ *Reasons behind Sentencing Strategy:* Having determined that the mitigating evidence at issue (or similar evidence) would have been available at McNair's sentencing, the court must now determine whether the failure to offer this evidence was a tactical choice by trial counsel. *Blanco,* 943 F.2d at 1500. If so, that tactical choice will be given a strong presumption of correctness. *Id.*

Numerous tactical decisions have been given credit as reasonable, often involving the balancing of strategy, possibly damaging cross-examination, and rebuttal witnesses. For instance, in *Chandler,* the Eleventh Circuit found that counsel was reasonable when counsel chose to focus on lingering doubt at sentencing and did not actively pursue character witnesses for mitigation, other than Chandler's wife and mother, out of fear of damaging cross-examination and rebuttal. 218 F.3d at 1321.[75] Similarly, in *Brown v. Jones,* 255 F.3d 1273, 1278 (11th Cir.2001), the court found that the defendant's attorney made a "reasonable tactical decision" not to enter evidence of the defendant's drug and alcohol abuse based on his belief that it would be more effective to argue that Brown, who had a boyish appearance, was a 'follower' led into an act inconsistent with his character. Likewise, the court found that counsel had made a reasonable tactical decision when it chose not to offer evidence of drug abuse because it may have been inconsistent with counsel's sentencing strategy to appeal to the jury for mercy based on the defendant's unfortunate childhood. *Duren v. Hopper,* 161 F.3d 655, 662 (11th Cir.1998). Generally, courts have found that where counsel had an articulable strategy at sentencing, and where the mitigation evidence at issue contradicted or weakened that strategy, counsel's decision not to enter the mitigation evidence was reasonable.

■■■■■ In contrast, "[a]bsent any viable strategic reason ... the failure to present available mitigating evidence renders assistance constitutionally ineffective." *Fortenberry v. Haley,* 297 F.3d 1213, 1230 (11th Cir.2002). "[T]he mere incantation of 'strategy' does not insulate attorney behavior from review; an attorney must have chosen not to present mitigating evidence after having investigated the defendant's background, and that choice must have been *reasonable* under the circumstances." *Stevens v. Zant,* 968 F.2d 1076, 1083 (11th Cir.1992). Therefore, courts have found counsel ineffective when mitigation evidence was not entered based on ignorance or misunderstanding of the law,[76] time con-

---

**75.** The *Chandler* court also found the record from the § 2255 hearing "clear" that trial counsel and his client met frequently before and during the trial, and that no one came forward with character evidence that the trial counsel thought was helpful. These conclusions are important because, as the *Chandler* court notes, "the reasonableness of a trial counsel's acts, including the lack of investigation ... depends 'critically' upon what information the client communicates to counsel."

218 F.3d at 1324. On its way to this conclusion, the *Chandler* court noted that the substance of many of these conversations remained unknown because trial counsel, at petitioner's request, asserted attorney-client privilege.

**76.** *See, e.g., Williams,* 529 U.S. at 395, 120 S.Ct. at 1514 (mitigation evidence not investigated because counsel incorrectly believed state law barred access to records); *Dobbs v.*

siderations,[77] and a simple failure to conduct any investigation into such evidence.[78] In addition, courts have found the failure to enter mitigation evidence to be unreasonable when the evidence entered was incomplete or partial. For example, in *Collier v. Turpin*, 177 F.3d 1184, 1201 (11th Cir.1999), the court found defendant's counsel to be ineffective when they asked many of their witnesses only about the defendant's reputation for veracity and truth. In *Blanco v. Singletary*, defense counsel planned to call family members to "verify [the defendant's] family ties; the fact that he left some of his family in Cuba when he left; the type of strain; the type of emotional state he might have been in because of that." 943 F.2d at 1502. Despite this strategy, however, counsel failed to introduce any testimony of family members or acquaintances. *Id.* The court found counsel's failure to follow through on his sentencing strategy, among other things, to be unreasonable.

The court finds that McNair's counsel's failure to offer the mitigating evidence was not a tactical decision. Unlike cases in which the decision not to introduce such evidence was based on tactical reasons, Decker disavowed making any of these decisions based on strategy; rather, he claims they were based on perceived constraints of time and money. While "courts must recognize that counsel does not enjoy the benefit of unlimited time and re-sources," *Chandler*, 218 F.3d at 1314 n. 14, Decker's testimony, in conjunction with Smith's and Segrest's, and in light of counsel's actual performance at trial, leads the court to conclude that time and financial constraints did not play a "reasonable" role in the strategic decisions in this case as contemplated in *Chandler*.

To begin, Decker's funding problems were, at least partially, alleviated by the court. While Decker's evidentiary hearing testimony makes clear that he felt time and financial constraints from his law firm, the record reveals that the trial court granted his motions for experts, investigators and a psychiatric examination.[79] In doing so, the court authorized funds for investigative services which counsel could have used to explore McNair's drug addiction and left open the possibility of hiring an expert. It is unclear why McNair's counsel did not take advantage of these resources in preparation for sentencing. Decker testified that, with regard to McNair's drug use, he "had to rely on what information was provided to [them] from the Sheriff's Office;"[80] however, the availability of funds from the court implies that this is not true. Similarly, the true extent of the constraints placed upon Decker by Segrest and his firm is unclear from the record. Indeed, Decker's testimony conflicts with Segrest's on this point. Furthermore, Smith, the senior lawyer in charge of the case, was unaware of Deck-

---

**77.** *See, e.g., Fortenberry,* 297 F.3d at 1231 (counsel not prepared at sentencing because they had "not had sufficient time to prepare").

*Turpin,* 142 F.3d 1383, 1388 (11th Cir.1998) (finding counsel ineffective for failing to enter mitigation evidence based on counsel's belief that the evidence was not admissible and could only be admitted to mitigate the crime).

**78.** *See, e.g., Blanco,* 943 F.2d at 1503 (the decision not to call mitigation witnesses was not based on a "result of investigation and evaluation").

**79.** Trial Tr. at 1963–68, 2215–20.

**80.** Evid. Hr'g Tr. Vol. I, at 34.

er's concern over lack of time and money to prepare properly.[81]

It remains undisputed that Decker based his decisions not to get experts or additional character evidence on perceived constraints of time and money. While it is reasonable for counsel to decide, upon consideration of time and money constraints, to pursue one strategy and not another, it is not reasonable to claim time and money necessitated particular decisions where there is evidence that funds were available and that the constraints were more perceived than real.

■ Moreover, this case also resembles those in which incomplete or partial mitigation evidence offered at sentencing constituted ineffective assistance of counsel.[82] For example, like the defendant in *Collier v. Turpin,* McNair had "been tied clearly to the crimes ..., had given a full confession to authorities, and seemed to be of reasonable health." 177 F.3d at 1200. Furthermore, counsel in McNair, like that in *Collier,* "intended to focus their efforts on presenting evidence that would mitigate [the defendant's] sentence." *Id.* Attorneys in both cases, however, failed to give a complete picture of the defendant which could provide a persuasive mitigation case. In *Collier,* counsel failed to offer evidence of Collier's "childhood, economic circumstances surrounding his upbringing, social environment in his hometown, diabetic condition as well as attendant physical and emotional problems, and specific events in his life that would have mitigated the sentence imposed by the jury .... [and] failed to pursue expert opinion testimony relating to his diabetes and to 'diffuse organic brain damage.'" *Id.* at 1199. Consequently, the court found that "[i]nstead of developing an image of Collier as a human being who was generally a good family man and a good public citizen, who had a background of poverty but who had worked hard as a child and as an adult to support his family and close relatives, counsels' presentation tended to give the impression that the witnesses knew little or nothing about Collier." *Id.* at 1202.

Similarly, McNair's counsel from the outset focused on a strategy designed to avoid capital punishment.[83] Therefore, Decker and Smith decided to enter evidence of McNair's drug use as mitigating evidence at sentencing.[84] They offered testimony from McNair's mother, Glanton, and uncle, Williams, regarding their awareness of McNair's drug use; indeed, Glanton sought out drug rehabilitation treatment for her son shortly before the murder. Neither of these witnesses, however, could testify as to the psychological or physiological effects of this addiction on McNair. To fill this gap, Decker unequivocally believed that expert testimony would be helpful mitigating evidence and

---

81. Evid. Hr'g Tr. Vol. II, at 34–35.

82. The court recognizes that entering some mitigating evidence, while not other mitigating evidence, is not always grounds for finding counsel acted unreasonably.

83. Evid. Hr'g Tr. Vol. II, at 34–36.

84. Evid. Hr'g Tr. Vol. I, at 22–23, 40–41. The one expert who did evaluate McNair before trial, Dr. Michael D'Errico, did not mention crack-cocaine use. D'Errico's report was drafted for the specific purpose of determining McNair's competency to stand trial. There is no evidence to support the State's claim that because defense counsel's relied on this report, their "choice" not to investigate this line of mitigation was reasonable. If they had, their reliance would have been further evidence of unreasonably deficient performance.

wanted to enter it at sentencing.[85] He neglected to do so. In failing to put on evidence which explained McNair's drug addiction and its effect on his behavior, as well as corroborating evidence from friends and family on changes in his behavior, Decker gave the sentencing judge an incomplete picture of McNair.

The issue in this case is not counsel's choice not to introduce drug-abuse evidence, but their choice to introduce evidence of drug use without additional evidence pertinent to its mitigating effect. By going only halfway, McNair's counsel effectively ensured that the evidence of drug use would be considered not a mitigating circumstance, but an aggravating circumstance at sentencing.[86] While it may have been reasonable for counsel to decide not to introduce evidence of drug abuse at sentencing, this court cannot find it reasonable for counsel to introduce "bad" facts of McNair's drug use, without the explanation upon which mitigation would be premised. It is one thing to argue, as McNair's counsel essentially did, that a defendant's drug use caused him to murder for money. It is entirely another to argue that a defendant was suffering from a medically recognized drug addiction which, though not rising to a level negating his specific intent to commit the crime, could help explain an act committed by a formerly lawful individual. In fact, by presenting drug use at sentencing without additional expert testimony, McNair's counsel did more harm to his case than good.

This kind of evidence, which bears on a defendant's mental state, but not to the extent that it negates the necessary mens rea for the crime, has been recognized by the Eleventh Circuit as important mitigating evidence to be entered at sentencing. "[T]here is a great difference between failing to present evidence sufficient to establish incompetency at trial and failing to pursue mental health mitigating evidence at all. One can be competent to stand trial and yet suffer from mental health problems that the sentencing jury and judge should have had an opportunity to consider." *Blanco,* 943 F.2d at 1503. The expert testimony offered by McNair at the evidentiary hearing was important for the same reason; moreover, Dr. Kirkland's testimony that McNair knew right from wrong at the time of the murder and was able to appreciate the criminality of his conduct, focused narrowly on the event of the murder itself. Drs. Morton and Waid, however, went on to address the effects of addiction on an individual's personality, the "inescapable cravings" caused by extensive crack-cocaine use, and obsession with getting more crack. Dr. Kirkland's narrow focus may be appropriate for the guilt phase, but the information provided by Drs. Morton and Waid was clearly relevant for sentencing.

---

**85.** *Id.* at 45.

**86.** In making this finding, the court recognizes that a defendant's drug use may harm his case for mitigation as readily as it helps it, and that it is therefore reasonable for defense counsel to choose not to introduce it. *See Housel v. Head,* 238 F.3d 1289, 1296 (11th Cir.2001); *Tompkins v. Moore,* 193 F.3d 1327, 1337 (11th Cir.1999). "Evidence of drug and alcohol abuse is a two-edged sword ... and a lawyer may reasonably decide that it could hurt as much as help the defense." *Housel,* 238 F.3d at 1296 (internal citation and quotation omitted). However, once McNair's counsel decided to enter such evidence as part of their strategy, they had a duty to follow through with their strategy completely, including the expert testimony they had originally contemplated.

Furthermore, the Eleventh Circuit has found that mental-health evidence of this kind is of significant importance in presenting a complete strategy at sentencing. Sentencing counsel in *Blanco* stated, "I need to prepare ... the psychiatric testimony of a Court-appointed psychiatrist." 943 F.2d at 1503. However, counsel later informed the court that no mental-health mitigation evidence existed. *Id.* The court therefore found that, "given that this discussion constituted the extent of counsels' investigation into the availability of mental health mitigating evidence, that such evidence was available, that absolutely none was presented to the sentencing body, and that no strategic reason has been put forward for this failure, we find that counsel's actions were objectively unreasonable." *Id.* This court comes to the same conclusion here. Though counsel contemplated and wanted expert testimony, and though this testimony was available, none was presented to the sentencing judge or jury and no reasonable strategic reason was offered for this failure. Hence, the court finds that McNair's counsel's actions were not a product of tactical decision-making and were also objectively unreasonable.

Finally, there is a unique aspect of this case which weighs in favor of finding the performance of McNair's counsel unreasonable at sentencing. McNair's lawyers had, in effect, two bites of the apple at sentencing; they chose to take only one. Because this case was remanded due to an evidentiary error at McNair's first sentencing, McNair's trial counsel had another opportunity to present additional and stronger mitigating evidence at his second sentencing hearing. This time McNair's counsel had the knowledge that their previous strategy was insufficient; however, instead of offering new or additional evidence, they presented a nearly identical case. Counsel's failure to do anything materially different at the second sentencing, when their professed goal was to secure a sentence of life without parole, is itself strong evidence of unreasonable performance.

*Summary:* In light of the evidence, this court concludes that McNair's counsel performed outside the bounds of reasonable representation during the penalty phase of the trial. This finding is in accord with other Eleventh Circuit cases with similar facts. *See, e.g., Baxter v. Thomas,* 45 F.3d 1501, 1514 (11th Cir.1995); *Tyler v. Kemp,* 755 F.2d 741, 744–45 (11th Cir.1985), *overruled in part on other grounds, Peek v. Kemp,* 784 F.2d 1479, 1494 n. 15 (11th Cir.1986); *King v. Strickland,* 748 F.2d 1462, 1463–64 (11th Cir.1984). McNair had confessed to the murder, and his attorneys decided to focus on saving him from the death penalty. They further chose to offer McNair's drug use as part of his mitigation case at sentencing. Nonetheless, they made no effort to pursue expert testimony or present character evidence which would demonstrate the mitigating effects of McNair's drug addiction. Furthermore, when given the opportunity to bolster their case at a second sentencing hearing, McNair's counsel instead chose to recycle an already failed strategy. There is no question that this was a failure of adequate representation.

### b. Prejudice

To succeed on an ineffective-assistance-of-counsel claim, McNair must also show that unreasonable performance by his counsel prejudiced the result he challenges. Specifically, he must show that "there is a reasonable probability that but for counsel's unprofessional errors, the result ... would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at

2068; *see also Williams*, 529 U.S. at 390, 120 S.Ct. at 1511; *Chandler*, 218 F.3d at 1313. In determining prejudice, a court examines whether the "entire postconviction record, viewed as a whole and cumulative of mitigation evidence presented originally, raised a 'reasonable probability that the result of the sentencing proceeding would have been different' if competent counsel had presented and explained the significance of all the available evidence." *Williams*, 529 U.S. at 399, 120 S.Ct. at 1516.

■ The Court in *Williams v. Taylor* considered the totality of available mitigation evidence and concluded that there was "a 'reasonable probability that the result of the sentencing proceeding would have been different' if competent counsel had presented and explained the significance of all the available evidence." *Id.* Although counsel presented two mitigating witnesses at sentencing, they failed to produce other evidence documenting Williams's abusive childhood, borderline mental retardation, history of head injuries and other mental impairments. While the Court recognized that not all of the additional evidence was favorable to the petitioner, such as his juvenile criminal record, the Court found that, considering all of the

available mitigating evidence as a whole, Williams was prejudiced by his counsel's failure to offer the evidence. *Id.* at 396, 120 S.Ct. at 1514. In making its decision, the Court indicated that a capital defendant can have a "constitutionally protected right ... to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer." *Williams*, 529 U.S. at 393, 120 S.Ct. at 1513. Moreover, *Williams* stands for the proposition that a habeas petitioner need not show ineffectiveness rising to a level that actually negates an aggravating capital sentencing factor in order to have demonstrated a reasonable probability that the outcome would have been different. *Id.* at 398, 120 S.Ct. at 1516.

For the same reasons, this court concludes that McNair's counsel was so ineffective as to prejudice McNair under the *Strickland* analysis. The expert testimony that McNair's counsel failed to produce would have helped the sentencing judge understand the night of the murder in a different light. The evidence would have shown that McNair had a biological condition, namely drug addiction, with which he had been struggling unsuccessfully for several years.[87] This evidence is similar to that discussed in *Blanco* and would have

---

**87.** The State's argument that evidence of drug use cannot be evidence in mitigation of the death penalty is not persuasive. As authority, the State points to *Waldrop v. Thigpen*, 857 F.Supp. 872, 919 (N.D.Ala.1994), *aff'd*, 77 F.3d 1308 (11th Cir.1996), which refused to find prejudice where counsel failed to introduce evidence of a petitioner's "long-standing history of excessive alcohol and multiple drug usage." That result is not controlling here because, in *Waldrop*, there was no evidence connecting the petitioner's drug use to the crime committed. This court agrees with *Waldrop* to the extent that it holds that alcohol and drug abuse, alone and unconnected to the crime, may not be a persuasive, mitigating factor. Here, expert testimony on McNair's

drug addiction goes directly to the events of the night in question. While such testimony does not justify what McNair did, it does provide a context that is immediate to the crime and directly relevant to McNair's state of mind, a critical factor for the trial court in making a sentencing determination. Furthermore, the State's categorical interpretation of *Waldrop* puts it into direct conflict with state law, which requires the sentencing court to consider "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers ... and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole

explained the stark change in McNair's formerly lawful behavior as his drug addiction developed. *Blanco*, 943 F.2d at 1502–03 (counsel failed to introduce evidence of defendant's family ties, his emotional state, and mental-health mitigating evidence). For example, evidence documented that McNair's increasing need for crack prompted him to sell his furniture and uncharacteristically commit two minor thefts. The expert testimony also would have explained and reinforced the evidence that he had been well-behaved in the structured, drug-free environment of prison. Without this expert testimony, the mitigating evidence that was presented was disjointed, lacked force and, indeed, was probably damaging. The additional testimony at the evidentiary hearing from family and friends was significant in that it corroborated the expert testimony presented by Dr. Morton and, to a greater extent, Dr. Waid.[88] As discussed above, McNair's trial counsel presented him to the jury as a drug user; effective counsel would have presented him as a "textbook" drug addict.

In addition, given that the crime was uncharacteristic for McNair, this evidence was particularly important to McNair's mitigation case and the failure to offer it was especially prejudicial. As the Eleventh Circuit has discussed, "Although we do not underestimate the strength of the[ ] aggravating factors, we believe that there is at least a reasonable probability that a jury confronted with the stark contrast between [the defendant's] acts on the day

of the crimes and his history would not have voted for the death sentence." *Collier*, 177 F.3d at 1203. In making this finding, the Eleventh Court referenced other Eleventh Circuit cases which have stated that cases involving "murders that are carefully planned, or accompanied by torture, rape or kidnaping" can be contrasted with crimes which are "borne of irrational and sudden temper." *Id.; see also Dobbs v. Turpin*, 142 F.3d 1383, 1389 (11th Cir.1998); *Jackson v. Herring*, 42 F.3d 1350, 1369 (11th Cir.1995). In cases such as these, where the crimes committed seem to be aberrations from otherwise lawful behavior, the Eleventh Circuit has recognized that mitigating evidence of good character and the uncharacteristic nature of the crime may have more impact than in other cases. *Collier*, 177 F.3d at 1203; *accord Harris v. Dugger*, 874 F.2d 756, 763–64 (11th Cir.1989) ("[E]vidence seeking to show appellant's character as being good may have had a greater impact on a jury deciding whether to impose the death penalty for this crime—a burglary gone horribly awry—as opposed to one involving murder as the intended goal...."). Thus, the mitigating evidence in question was of special importance in this case, one in which McNair's crime was neither pre-planned nor characteristic of his personality and where McNair had no prior significant criminal history.

After reviewing the totality of the mitigating evidence, the court finds that McNair has demonstrated a reasonable probability that the outcome of the sen-

---

instead of death." 1975 Ala.Code § 13A–5–52.

**88.** The court does not find this additional character testimony significant simply because it puts McNair in a more favorable light than the testimony originally presented. To that extent, it is duplicative of the original

testimony of Glanton and Williams. It would not be appropriate to grant relief on an ineffective-assistance-of-counsel claim based merely upon a less than thorough presentation of character evidence, and the court emphasizes that it is not doing so here.

tencing proceeding would have been different if "competent counsel had presented and explained the significance of all the available evidence." *Williams*, 529 U.S. at 399, 120 S.Ct. at 1516. The expert testimony and additional character testimony would have given the sentencing judge a complete understanding of McNair's personal history; the omission of this important information undeniably prejudiced McNair.[89] Because this court finds both unreasonable performance and prejudice, McNair is entitled to relief under *Strickland* for his counsel's penalty-phase performance.

### D. RACIAL DISCRIMINATION IN THE SELECTION OF THE GRAND JURY FOREPERSON

■ McNair has raised this claim only one time before, on direct appeal to the Alabama Supreme Court. Under the authority of *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), he argues that the Henry County method of selecting grand jury forepersons—by which no African–Americans were selected from 1973 for 1993—is racially discriminatory and violated his equal-protection rights under the Fourteenth Amendment. He submits one document in support of this claim: a 1994 affidavit from the Cir-

cuit Clerk of Henry County with a list noting the race and gender of grand jury forepersons between the fall of 1973 and 1993. The Alabama Supreme Court refused to consider the affidavit because it was "outside the record" and denied McNair's claim under "plain error" review. *Ex Parte McNair*, 653 So.2d at 360. McNair asks this court to admit the affidavit under Rule 7(a) of the Rules Governing § 2254 Cases,[90] which allows the court to direct the parties to expand the record available for review "by the inclusion of additional materials relevant to the determination of the merits of the petition." "Affidavits may be submitted and considered as part of the record." Rules Governing § 2254 Cases, Rule 7(b).

For the reasons that follow, this court will not admit the affidavit under Rule 7 and finds that McNair is not entitled to relief on the basis of this claim.

Rule 7 itself does not limit the circumstances in which additional evidence may be provided to the court. For example, in *Vasquez v. Hillery*, 474 U.S. 254, 260, 106 S.Ct. 617, 621, 88 L.Ed.2d 598 (1986), the lower court admitted, under Rule 7, affidavits and a computer analysis of the racial composition of grand juries when "motivated by a responsible concern that [the

---

89. This conclusion does not change simply because the trial judge, not the jury, is the ultimate sentencing authority under Alabama law. Federal courts have found valid ineffective-assistance-of-counsel claims on habeas-corpus petitions when capital sentencing juries have recommended life and been overridden by a judicial sentence of death. *See, e.g., Porter v. Wainwright*, 805 F.2d 930, 937 (11th Cir.1986) (remanding, for evidentiary hearing, defendant's claim of ineffective assistance of counsel at sentencing); *Douglas v. Wainwright*, 714 F.2d 1532, 1557–58 (11th Cir. 1983) (finding defense counsel ineffective at sentencing).

90. In this court's order of May 11, 2000, McNair's request for an evidentiary hearing on this claim was denied. *McNair*, 97 F.Supp.2d at 1280–86. That order did not foreclose the possibility of introducing the affidavit under Rule 7. After ruling that the reach and purpose of Rule 7 are not the same as those for evidentiary hearings under § 2254(e)(2) post-AEDPA, the court noted it would not "reach the issue of the actual availability of Rule 7 unless and until the petitioner seeks relief under the rule." *Id.* at 1286. That issue is now before the court.

court] provide the meaningful federal review of constitutional claims that the writ of habeas corpus has contemplated throughout its history." In *Porcaro v. United States*, 832 F.2d 208, 212 (1st Cir. 1987), the court found that Rule 7 was properly employed in order to avoid the expense of an unnecessary evidentiary hearing.

While Rule 7 itself imposes no limitations on the admission of additional evidence, the court's power under Rule 7 is not unlimited. Because habeas petitioners must exhaust state-court remedies before pursuing a claim in federal court, the Supreme Court has held that evidence can be admitted under Rule 7, without violating exhaustion requirements, only when the additional evidence does not "fundamentally alter the legal claim already considered by the state courts." *Vasquez*, 474 U.S. at 260, 106 S.Ct. at 622. The prevailing view in the Courts of Appeals is that evidence offered pursuant to Rule 7 after a state court's review of a claim impermissibly undermines the exhaustion requirement of § 2254(c) when it transforms the claim "into a significantly different and more substantial claim, placing the claim in a significantly different and stronger posture than it was when the state courts considered it." *Demarest v. Price*, 130 F.3d 922, 935 (10th Cir.1997) (quotations omitted); *see also Aiken v. Spalding*, 841 F.2d 881, 884 n. 3 (9th Cir.1988) (distinguishing *Vasquez* by noting the court's role in requesting additional evidence and that the evidence requested "added nothing to the case"); *Wise v. Warden, Maryland Penitentiary*, 839 F.2d 1030, 1034 (4th Cir. 1988) (finding that the offered evidence significantly altered the petitioner's claim and that the state court had to be given an opportunity to evaluate the claim in its new posture).

While the State did not raise exhaustion as a defense in Stage I of this case, McNair's Rule 7 request does raise exhaustion concerns and leads this court to conclude that admission of the affidavit would be improper. As the Alabama Supreme Court noted, there is no other evidence in the record that even refers to the history of selecting the foreperson of grand juries in Henry County. *Ex parte McNair*, 653 So.2d at 360. But for the evidence presented in this affidavit, McNair has no *Rose* claim. Therefore, admitting the affidavit would transform a completely unsupported claim into a "significantly different and more substantial claim." *Demarest*, 130 F.3d at 935. Indeed, without having considered the essential affidavit, the state court cannot be said to have actually adjudicated this matter.

Furthermore, although the Court in *Vasquez* addressed a similar situation and admitted additional evidence under Rule 7, the court in *Vasquez* sought additional information *sua sponte*. Where one of the parties seeks to expand the record, there is a greater concern that a party has "attempted to expedite federal review by deliberately withholding essential facts from the state courts"—that is, "sandbag" his claim—thus undermining the principle of comity that exhaustion is meant to protect. *Vasquez*, 474 U.S. at 260, 106 S.Ct. at 622. Here, McNair offers the affidavit himself, raising the concern noted in *Vasquez*. In addition, the Court in *Vasquez* found that admission of the evidence did not violate the exhaustion requirement because the additional evidence did not "fundamentally alter the legal claim already considered by the state court," and the decision in no way abrogated the general rule that additional evidence may not be admitted when doing so would transform the claim into a significantly different, stronger claim. *Id.*

Finally, this court's decision is not affected by the fact that the state court had the evidence in front of it and did not consider it. McNair's contention that his rights are being harmed because the Alabama Supreme Court "chose not to take the opportunity to correct an error of constitutional significance" [91] mischaracterizes that court's ruling. That court did review McNair's claim but was procedurally barred from considering the affidavit because it was not part of the record. Under the rules of appellate procedure in effect at the time of the decision, the Alabama Supreme Court, on review of a death penalty case by certiorari, "may notice any plain error or defect in the proceeding under review, whether or not brought to the attention of the trial court." Ala. R.App. P. 39(k) (1995) (amended 2000). Otherwise, review is limited "to the facts stated in the opinion of the particular court of appeals." *Id.* The Alabama Supreme Court did not review the affidavit because doing so "would unduly enlarge the scope of the plain error review as authorized by our appellate rules." [92] *Ex parte McNair,* 653 So.2d at 360; *accord Ex Parte Watkins,* 509 So.2d 1074, 1076 (Ala.1987). McNair was procedurally barred in state court from introducing the affidavit and did not produce evidence of prejudice or cause here such that this court could consider the affidavit. *See Pitts v. Cook,* 923 F.2d 1568, 1571 (11th Cir.1991) ("When a defendant is barred from raising a federal constitutional claim in the state courts because of his failure to follow the state's procedural rules, he is also barred from raising the claim in his federal habeas petition absent a showing of cause for, and actual prejudice from, the procedural default.") Thus, the court must reject McNair's contention that the Alabama Supreme Court "chose not to take the opportunity to correct an error of constitutional significance."

Accordingly, this court will not admit the clerk's affidavit under Rule 7. Without that affidavit, there is no evidence in the record to support McNair's claim. This court agrees with the Alabama Supreme Court in that respect and does not disturb its decision.

## E. DISTRICT ATTORNEY MISCONDUCT

McNair's fifth claim is that the conduct of District Attorney Valeska deprived him of his constitutional right to a fair trial under the Sixth Amendment. As a general matter, prosecutorial misconduct that undermines the fairness and integrity of a trial can be so prejudicial to the accused that it rises to the level of a constitutional violation. *See Berger v. United States,* 295 U.S. 78, 89, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935); *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986). A single act alone or multiple acts together can make prejudice to the accused "highly probable" and trigger a constitutional violation; in either case the alleged misconduct must be evaluated in the context of the full record and arguments made by both sides. *See Darden,* 477 U.S. at 179,

---

**91.** Petitioner's Habeas Corpus Reply Brief on the Merits, filed November 13, 2000 (doc. no. 92) (Pet'r Reply Br.), at 25.

**92.** McNair points to two cases from the Alabama Circuit Court of Criminal Appeals where a remand to the trial court for further development of the record was ordered. Pet'r Reply Br. at 26. These cases are inapposite because review in the Court of Criminal Appeals is not governed by Rule 39 of the Alabama Rules of Appellate Procedure.

106 S.Ct. at 2470; *cf. Bruton v. United States*, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968) ("Not every admission of inadmissible ... evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently.").

McNair's challenge to Valeska's conduct takes two forms. First, he raises nine specific instances of misconduct, each of which, he claims, is sufficient on its own to warrant a new trial. The Alabama Court of Criminal Appeals reviewed, and rejected, all nine of these claims. *McNair*, 653 So.2d at 330–42. Accordingly, McNair now argues that the state court made an unreasonable determination of the facts in light of the evidence presented and that he is therefore entitled to relief under § 2254(d)(2). Second, he argues that these nine instances of misconduct, taken together as a whole, deprived him of a fair trial. The Court of Criminal Appeals also rejected this claim. *Id.* at 331. On this ground, he seeks relief under § 2254(d)(1), claiming that the state court's analysis involved an unreasonable application of federal law. For the reasons that follow, this court finds that no relief is due to be granted under either prong of McNair's argument.

### 1. Individual Acts of Misconduct

■ *Introduction of Prior Bad Acts:* In McNair's first allegation of misconduct, he asserts that Valeska improperly referenced a prior *nolo contendere* plea in Florida. The reference came during closing arguments and is contained, in its entirety, in the following excerpt from trial:

"Remember, now, this is evidence. Have you ever been in trouble before,

Mr. McNair? Well, there's a little bit down in Florida. That's evidence. Remember that? It's on that tape. You listen to it." [93]

McNair advances three reasons why this reference was particularly prejudicial: (1) there was no evidence before the jury about this nolo contendere plea; (2) Alabama law prohibits the use of nolo contendere pleas as a basis for inferring guilt; and (3) the trial court had granted defense counsel's pre-trial motion *in limine* prohibiting the prosecutor from using this information.

■ The Court of Criminal Appeals reviewed this passage for plain error, as no objection was made to it during trial, and found that "[g]iven the brevity and the vagueness of this comment, the alleged impropriety does not rise to the level of plain error." *McNair*, 653 So.2d at 341. This was a reasonable determination of the facts by the state court. While McNair is correct to observe that evidence of prior bad acts can be prejudicial, *See, e.g., Michelson v. United States*, 335 U.S. 469, 475, 69 S.Ct. 213, 218, 93 L.Ed. 168 (1948) ("The State may not show defendant's prior trouble with the law ... even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime."), there exists no *per se* rule that an allusion during closing argument to past criminal conduct deprives a defendant of a fair trial. Whether the reference is unconstitutionally prejudicial remains within the discretion of the court on a review of all circumstances. McNair has presented no evidence that the state court's decision was unreasonable in light of the facts before it; the reference was brief and indirect, and it was argument, not evidence.

---

**93.** Trial Tr. at 1628.

 *Injection of Death–Penalty Considerations During Guilt Phase:* McNair raises the prosecutor's discussion of the death penalty during closing arguments as misconduct that compromised the integrity and reliability of the guilt phase of the trial. As with McNair's previous allegation of misconduct, the trial court granted McNair's motion *in limine* and barred the prosecutor from raising the issue of punishment during this phase of the trial.[94] Referring to the death penalty during closing arguments in the guilt phase of trial can be improperly prejudicial, but there is no *per se* rule requiring a mistrial when such references are made. *Beck v. Alabama,* 447 U.S. 625, 642 n. 19, 100 S.Ct. 2382, 2392 n. 19, 65 L.Ed.2d 392 (1980) (noting that argument over the death penalty at the guilt phase of a capital murder trial can distract the jury from its task of determining if the State has proven each element of the crime beyond a reasonable doubt).

Viewed in the context of the closing arguments made by both sides, the state court came to a reasonable conclusion. Valeska alluded to the death penalty once in his closing; in reference to McNair's first written statement to the police, he stated that McNair "signed his own death warrant right there."[95] McNair's own counsel also brought up the issue of punishment in his closing, but much more extensively than Valeska. He asked the jury to show mercy for McNair by convicting him of the lesser included offense of intentional murder;[96] in making this argument, McNair's counsel focused the jury's attention on the implications their decision in the guilt phase would have on punishment. McNair's counsel characterized the death penalty as "outmoded, ineffectual and un-Christian,"[97] and he made a direct appeal to the mercy and conscience of the jury:

> "And when my time comes and your time comes, are we going to be able to lay down, like the poet says, and wrap the drapes of our couch about us and lie down to pleasant dreams? Or are we going to go screaming and hollering like the quarry slave at night, as the poet says?
>
> "It depends on how you live. It depends on how many good things you do for your neighbor. That's what I am taught. How much mercy you show to your fellow man.
>
> "Whether or not you can lie down to pleasant dreams with the thought of sending this man to death bears on my mind because of the facts of this case."[98]

In response to defense counsel's closing, Valeska returned to the topic of the death penalty in his final closing. The following passages typify his argument:

> "And then [defense counsel] talks about England and being back in the Dark Ages and the cave. The Alabama legislature said in Alabama we're going to have the death penalty. And the United States Supreme Court, that's got people from all races and life, said that the death penalty is Constitutional in this state.
>
> . . . .
>
> "But I believe justice cries out in this case because of the heinous, atrocious,

---

94. *Id.* at 2264, 2272.

95. *Id.* at 1610.

96. *Id.* at 1642–44.

97. *Id.* at 1639–42.

98. *Id.* at 1678–79.

and cruel way in what they did to her calls for the death penalty.

"And don't be afraid. I submit when your time comes, Jesus, God, whoever you believe in, will tell you you did the right thing. It's the State. And he'll say Valeska is the one who asked for the death penalty. And we believe you're going to do it and do what's right."[99]

The state court came to two conclusions based on this record. First, it found Valeska's first reference to the death penalty—a comment about McNair's confession—was not proper, but also not "so egregious or obvious as to seriously affect the fairness or integrity of the judicial proceedings." McNair, 653 So.2d at 339 (quotations omitted). Second, it found Valeska's references to punishment in his second closing to be a "reply-in-kind." Id. Both conclusions were reasonable interpretations of the facts under § 2254(d)(2).

▪ Alone, Valeska's first reference to punishment is reasonably seen as minor—he alludes to the death penalty once in reference to admitted evidence. References in his second argument are undoubtedly extensive and, had they been 'unprovoked' by similar references by the defendant to punishment, may have been grounds for a mistrial. But the record shows that the defendant initiated discussion of punishment, and it was reasonable for the state court to determine that Valeska's second set of references to punishment was a "reply-in-kind." The Constitution does not prohibit such a reply from a prosecutor once the defendant has

raised the issue. Blackmon v. State, 574 So.2d 1037, 1040 (Ala.Crim.App.1990); cf. United States v. Robinson, 485 U.S. 25, 32, 108 S.Ct. 864, 868, 99 L.Ed.2d 23 (1988) (finding no Fifth Amendment violation where the prosecutor commented in closing that defendant could have taken the stand and explained his side of the story, when the remarks followed defense counsel's closing argument that the government had not allowed defendant, who did not testify, to explain his side of the story). On this record, therefore, the state court's determination was a reasonable interpretation of the facts.

▪ Using Prejudicial Names to Refer to McNair: A prosecutor may refer to a defendant in unfavorable terms so long as the evidence warrants the use of the terms. Nicks v. State, 521 So.2d 1018, 1022–23 (Ala.Crim.App.1987). During closing argument, Valeska referred to McNair as "death and destruction,"[100] "death,"[101] "diabolical,"[102] and a "brute."[103] McNair argues that these descriptions violated his constitutional rights and that the Alabama Court of Criminal Appeals was unreasonable in concluding that they were "amply supported by the evidence" and, while improper, "not prejudicial enough to cause a reversal." McNair, 653 So.2d at 341. Although the state court was admittedly lax in citing to evidence supporting these characterizations of McNair, the record is replete with evidence describing the brutal nature of the crime. McNair's argument that the state court was wrong to find Valeska's statements harmless is just that—argu-

99. Id. at 1691–92, 1701–02.

100. Id. at 1596, 1601.

101. Id. at 1576.

102. Id. at 1601.

103. Id. at 1690.

ment. He offers no clear and convincing evidence to rebut the presumption of correctness this court accords the state-court finding. Valeska's choice in terms was, as the state court noted, not to be commended. However, in light of the full record, which included extensive details of the crime, it was not unreasonable for that same court to conclude that these statements did not rise to a level that undermined the fairness of McNair's trial.

 *Contrasting McNair's Rights with the Rights of the Victim:* McNair identifies six occasions during closing arguments where Valeska referred to rights of the victim and compared them to McNair's constitutional rights as a criminal defendant.[104] This passage is a fair example of the sort of rhetoric used by Valeska:

> "Out there in the residence of a blue frame wooden house, a sixty eight year old senior citizen who had the right to live, a right to come and go, to breathe, and a right to be protected. Just like he has Constitutional rights that should be protected, so does she. So does she." [105]

The basis of McNair's objection for each of these occasions is essentially the same: Valeska's references to Riley's rights require a new trial because it is constitutionally improper to argue to jurors that their role is to decide a defendant's guilt by comparing the rights of the defendant and the victim. Once again, the Alabama Court of Criminal Appeals found Valeska's actions improper, but not sufficiently prejudicial to undermine the fairness of trial. *McNair*, 653 So.2d at 337–38. The State contends that the state court was reasonable to conclude that these remarks "were valued by the jury at their true worth, as having been uttered in the heat of debate and were not expected to become factors in the formation of the verdict." *Id.* at 337. McNair, again, counters that this conclusion was not supported by the evidence, and that Valeska's comparisons of the victim's rights with McNair's were so predominant in closing arguments that they "very likely did become part of the formation of the verdict." [106]

 This court finds that the Court of Criminal Appeals made a reasonable determination of the facts, and that McNair has not produced clear and convincing evidence that the state court's conclusion should be disturbed. The state court relied on four state-court cases from outside of Alabama to illustrate situations where courts have found references to a victim's rights improper, but not so severe as to require a mistrial. *Id.* at 337–38. This underscores the fundamentally fact-based nature of the state court's conclusion; because there is no *per se* rule requiring a new trial when a prosecutor introduces the rights of the victim in closing arguments, a court facing this claim on direct review must review the totality of the circumstances to decide whether the misconduct rose to a level that undermined the fairness of the trial. The state court found it did not, and McNair has cited no case establishing a clear line marking the bounds of propriety. While six references to a victim's rights is certainly extensive, it is not so extensive as to require this court to find that the factual determination of the state court was unreasonable.

 *Courtroom Demonstrations:* During closing arguments, Valeska engaged in

---

104. *Id.* at 1574, 1578, 1602, 1603, 1615, 1700–01.

105. *Id.* at 1578.

106. Pet'r Br. at 93.

"flamboyant" conduct, *McNair*, 653 So.2d at 336, that McNair argues was improper and grounds for mistrial. Valeska placed Riley's bloody nightgown over a chair and referred to it as the victim [107] and shoved the defense table into McNair, purportedly as a demonstration of the struggle between McNair and Riley.[108] The Court of Criminal Appeals concluded the prosecutor "did not venture outside the circumstances of the offense to inflame the jury with irrelevant emotional considerations." *Id.* This court finds that McNair has not shown by clear and convincing evidence that this decision was unreasonable. The nightgown had been admitted as evidence, which implies the trial court found it relevant to the case. Also relevant was testimony concerning the struggle between McNair and Riley when she was murdered, testimony which formed the basis for Valeska's demonstration, albeit a flamboyant one, during closing argument. It is usually in the interest of a criminal defendant to sanitize the events of the crime just as it is usually in the interest of the prosecutor to humanize them. While relief is warranted in extreme cases, McNair has offered no argument or case law to support that conclusion here.

■ *Reference to the Character of the Victim:* McNair points to the following passage as an impermissible attempt by the prosecutor to use the good character of the victim to persuade the jury to find him guilty:

"But I submit to you; I ask you to look back on the evidence, and I ask each and every one, on May the 21st, 1990, Ella Foy Riley in her home where she thought she was safe and secure, where she had lived for more than twenty-plus years, and she was a living, breathing, human being. She was a widow. She was a Godmother. She was a grandmother. And she was a mother. And she was a good human being. She was loving. She was kind." [109]

The Court of Criminal Appeals noted that Valeska's references to Riley's kindness (as well as her solitude and frailty, which were mentioned in other comments by Valeska) were "at least tangentially relevant to the trial issue of the appellant's state of mind. The prosecutor was entitled to draw the inference that the appellant's awareness of these characteristics had a bearing on his intent in going to the victim's home on the night in question." *McNair*, 653 So.2d at 332. To be sure, this evidence was, at best, tangentially relevant to McNair's guilt and mainly served to humanize the victim for the jury. Nonetheless, the state court concluded that any error that may have occurred was harmless. *Id.* In reaching this conclusion, the court noted that evidence of McNair's guilt was so overwhelming that these references could not have influenced the jury. *Id.* (citing *Darden*, 477 U.S. at 182, 106 S.Ct. at 2472). Without presenting this court with more, McNair has not met his burden under § 2254(d)(2).

■ *Reference to Impact of the Victim's Death on Her Family:* McNair objects to another, admittedly irrelevant, line of argument by Valeska in his closing: the impact of Riley's murder on her family. Valeska's emotional appeal to the jury included reference to the testimony of Riley's granddaughter, Kristi Jones, and

---

**107.** Trial Tr. at 1691–93.

**108.** *Id.* at 1606.

**109.** *Id.* at 1579.

their close relationship,[110] and the emotional effect on Pat Jones of finding her mother murdered.[111] The Court of Criminal Appeals noted that Valeska's arguments were tied to testimony given by both witnesses during trial and that, while emotional, the arguments were not unconstitutionally prejudicial. *McNair*, 653 So.2d at 335–36. It found that with respect to references to Kristi Jones, no objection was made at the time of argument and the court did not find them plainly erroneous; references to Pat Jones were also not plainly erroneous because the effect on a daughter of finding her mother's body would be obvious to a jury. *Id.* at 333–34. The state court also found that any potential prejudice was minimized by the limiting instructions given by the trial judge that the jurors "should not allow either sympathy or prejudice or anything other than the facts to be involved" in their deliberations and that they should "totally disregard" problems of family members. *Id.* at 335 (quoting Trial Tr. at 1593–94).

McNair understandably disagrees with the state court's conclusion, but he has not presented clear and convincing evidence that it was unreasonable. As with so much of Valeska's closing argument, he again crossed the line of proper prosecutorial conduct, this time requiring the court to instruct the jury to give his argument no weight. A court on direct review of his acts could reasonably find a constitutional violation. This review, though, is governed by § 2254(d)(2) and demands deference to the state court absent clear and convincing evidence the ruling was unreasonable; accordingly, the state court's ruling should stand.

■ *Prosecutor's Instructions to Jurors that It Was Their 'Job' to Convict McNair:* McNair argues that, in the following passage, Valeska improperly led the jury to believe that it had a 'job' to do in convicting McNair, regardless of their responsibility to weigh the evidence and follow the court's instructions.

"And it's hard. And it's tough. He says, can you put your pillow on your head. Can you do the right thing? Are you sure when you go to meet your maker? Well, I tell you when my time comes, I'm going to go up there, and I'm going to see Ella Foy. I'm going to say, Ella Foy, I did my job. I did what was right. And you're going to do what's right in this case." [112]

The Court of Criminal Appeals denied relief on this claim, finding that the prosecutor was "responding in kind to defense counsel's religious appeals for mercy and denunciation of the law of 'an eye for an eye and a tooth for a tooth.'" *McNair*, 653 So.2d at 340. This court finds the state court made a reasonable determination of the facts.

■ In *United States v. Young*, 470 U.S. 1, 18, 105 S.Ct. 1038, 1047–48, 84 L.Ed.2d 1 (1985), the Supreme Court noted that it can be improper for a prosecutor to exert pressure on a jury by exhorting it to "do its job." *Young* provides the basis for relief only if such a comment is prejudicial in the overall context of the prosecutor's and defense counsel's remarks. 470 U.S. at 18, 105 S.Ct. at 1048. If, as the court concluded in *Young*, a review of the entire context of the argument shows that "the jury was not influenced to stray from its responsibility to be fair and unbiased,"

**110.** *Id.* at 1590–94.

**111.** *Id.* at 1614.

**112.** *Id.* at 1689.

then relief is not warranted. *Id.* The state court here impliedly found that this standard had not been breached because Valeska's statement was a "reply-in-kind." Even if, as McNair argues, some of the defense's calls for mercy were only intended to urge the jurors to follow the law, given the full context of the defense counsel's argument—including his attack on the propriety of the death penalty itself—it was reasonable to conclude that the arguments of both sides cancelled each other and did not undermine the fairness of the trial.

 *Alleged Diminution of Jurors' Sense of Responsibility:* McNair's final, individual instance of purported misconduct involves the following passage:

> "Ladies and Gentlemen, they talk about the death penalty. When I took the oath of office of district attorney, I promised to enforce the laws. And the death penalty is Constitutional.
>
> "It says in those aggravating circumstances where it's warranted, we have the right to put people to death. And I'm not going to stand up here and apologize.
>
> "It's not you putting someone to death. It's me. I'm the State. And I have no problems with that, none whatsoever. It's not easy. And it's not pleasant. But it's the law in this community." [113]

McNair argues that Valeska's suggestion that he, not the jurors, had the ultimate responsibility for reaching a verdict that could lead to a death sentence violates

*Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The state court found that *Caldwell* was not violated. *McNair,* 653 So.2d at 340. This court finds the state court's conclusion a reasonable one not because the statements did not violate *Caldwell,* but because they did not violate the Sixth Amendment.

To the extent the state court relied upon *Caldwell* as the basis of its decision, it was in error. [114] *Caldwell* holds that death sentences issued by a sentencer who has been told that responsibility for determining the appropriateness of the death sentence lies elsewhere violate the Eighth Amendment. 472 U.S. at 328–29, 105 S.Ct. at 2639. McNair does not challenge Valeska's conduct at his sentencing; rather, he challenges comments made during the guilt phase of his trial. Thus, *Caldwell* does not apply. *See Darden,* 477 U.S. at 183 n. 15, 106 S.Ct. at 2472 n. 15 (noting that comments made at the guilt phase of a trial have a greatly reduced chance of having "any effect at all on sentencing"); *see also Tucker v. Kemp,* 802 F.2d 1293, 1296 (11th Cir.1986).

In any event, Valeska's arguments must still conform to the requirements of the Sixth Amendment, as already discussed at length above. In its analysis, the state court concluded that Valeska's argument was a "response to the defense counsel's argument that the jurors would not have 'pleasant dreams' after their own death unless they showed the appellant mercy and an assertion that the jurors should not refuse to impose the death penalty in an

---

113. *Id.* at 1694–95.

114. The precise grounds on which the state court decided this claim are not clear. Its ruling appears to conflate the Sixth and Eighth Amendments standards, noting both that it did not "believe [Valeska's] argument violated *Caldwell* " and that "although both attorneys mentioned punishment in their arguments at the guilt phase, that issue was not decided by the jury's verdict of guilt." *McNair,* 653 So.2d at 340.

appropriate case because of their fear of spiritual damnation." *McNair,* 653 So.2d at 340. This is, essentially, a finding that Valeska's remarks were a 'reply-in-kind' to the defense counsel's introduction of penalty considerations in his closing argument. Understood this way, this claim becomes indistinguishable from McNair's second and fifth claims of misconduct. Here, as in those claims, this court finds it was reasonable to conclude that the error, if any, that occurred did not undermine the fairness of the proceedings or trigger a Sixth Amendment violation.

### 2. Cumulative Misconduct

■■■ Finally, McNair argues that the cumulative effect of all the errors discussed above "so infected [his] trial with unfairness as to make the resulting conviction a denial of due process." *Darden,* 477 U.S. at 181, 106 S.Ct. at 2471. He claims that the Court of Criminal Appeals came to an unreasonable legal conclusion under § 2254(d)(1) by finding otherwise. The state court concluded that, "while portions [of the prosecutor's closing argument] were improper and objectionable, no comment, viewed alone or in combination with other arguments, was so prejudicial as to deprive the appellant of a fair trial or to undermine confidence in the verdict of guilt." *McNair,* 653 So.2d at 331. The court's determination of the law was a reasonable one and it does not warrant relief.

This case is similar to *Darden,* where the Supreme Court did not grant relief in spite of a series of improper remarks by the prosecutor in closing arguments. The *Darden* Court, in reviewing the totality of the circumstances, found that, because of defendant's closing arguments, the judge's instructions to the jury, the weight of the evidence against the defendant, and tactical decisions by defense counsel, the overall trial was fair, if imperfect. 477 U.S. at 182–83, 106 S.Ct. at 2472. At least three of the mitigating circumstances present in *Darden* are also present here. First, the state court found three of the challenged acts to be 'replies-in-kind' to the defense's closing argument; second, the judge instructed the jury not to consider the lawyers' arguments as evidence in the case; and, third, there was substantial evidence of McNair's guilt, namely his confession, for the jury to consider. It is not for this court to determine if the state court was exacting in its comparison of McNair's case with *Darden*—that comparison need only be a reasonable one. Because the presence to some degree of three of the ameliorating factors in *Darden* strongly supports the reasonability of the state court's decision, the court finds that the state court's application of law was reasonable and that relief is not warranted on this claim.

## F. INEFFECTIVE ASSISTANCE OF COUNSEL—GUILT PHASE·

McNair also makes an ineffective-assistance-of-counsel claim with respect to his representation at the guilt phase of the trial. This claim, like the one for ineffective assistance at the penalty phase, relies on testimony taken at this court's evidentiary hearing about McNair's crack-cocaine addiction. Because this testimony was not before the state courts, there has not yet been an adjudication on the merits.[115]

---

**115.** This claim was raised on state collateral appeal, but, in the absence of any evidence that "there was a reasonable probability that an expert would have assisted his defense," the court denied relief. *McNair,* 706 So.2d at 841. In doing so, it noted that a forensic

Even so, for the reasons that follow, this claim is due to be denied.

■ McNair argues that his trial counsel was ineffective because they failed to develop McNair's alleged intoxication at the time of the crime to negate the specific intent necessary for intentional murder. "Thus, if the evidence tended to show that the petitioner was intoxicated at the time of the offense, the jury could have found Mr. McNair not guilty of capital murder and could have convicted him of the lesser included offense of manslaughter." [116] There is no question that McNair's trial counsel knew about his drug use by the time trial began. Testimony from the evidentiary hearing indicates that they did not pursue evidence of drug use for lack of time and money. Under *Strickland*, McNair must show (1) unreasonable performance by counsel that (2) caused him prejudice. 466 U.S. at 687, 104 S.Ct. at 2064. Unlike McNair's earlier, successful ineffectiveness-of-counsel claim, this one fails both prongs of *Strickland*.

■ For performance to be prejudicial, there must be a reasonable probability that the outcome of the trial would have been different but for counsel's errors. *Id.* at 694, 104 S.Ct. at 2068. Based on the evidence presented at the evidentiary hearing, McNair has not established a probability that evidence of his intoxication would have been sufficient, under Alabama law, to negate the intent necessary for intentional murder. As the Alabama Supreme Court has recently reemphasized:

"[T]he degree of intoxication necessary to negate specific intent and, thus, reduce the grade of an offense must amount to 'insanity.' Mere drunkenness, voluntarily produced, is never a defense against a criminal charge, and can never palliate or reduce the grade of an offense, unless it is so extreme as to render impossible some mental condition which is an essential element of the criminal act."

■ *Ex Parte Thomas,* 766 So.2d 975, 978 (Ala.2000) (citation omitted). Details of the defendant's behavior during and after the crime that are inconsistent with diminished capacity—such as evidence that the crime was thoughtfully planned and carried out or that the defendant can recollect the details of the crime—can undermine an intoxication argument. *Ex Parte McWhorter,* 781 So.2d 330, 342 (Ala.2000).

At trial, McNair's uncle, Andrew Williams, testified that McNair was "on drugs" when he arrived home the night of the killing. *McNair,* 706 So.2d at 840 n. 7. The government's expert, Dr. Kirkland, testified at the evidentiary hearing that McNair reported using crack-cocaine and alcohol the night of the murder.[117] Dr. Kirkland also testified that McNair had a complete memory of the offense and was "able to talk about his reasoning and his thought process and feeling during the event and after the event." [118] McNair also recounted for Dr. Kirkland that he remembered stabbing Riley with two

---

psychological examination performed by Dr. D'Errico and facts about the crime itself showed that McNair's ability to conform his conduct to the requirements of the law was not substantially impaired. *Id.* at 841 n. 7. The jury was instructed as to voluntary intoxication, but did not find it present in McNair's case. *Id.*

**116.** Pet'r Br. at 111.

**117.** Evid. Hr'g Tr. Vol. II at 12.

**118.** *Id.*

knives.[119] Finally, it is uncontested that, on the day after the murder, McNair led police to the location where he disposed of Riley's purse. Under Alabama law, each of these facts can weigh against the conclusion that McNair was 'insane' at the time of the murder. Accordingly, this court cannot say that there is a reasonable probability that a jury, with the evidence now before this court, would have concluded that McNair did not have the intent to kill Riley.

 Even if this failure was prejudicial, McNair has also failed to establish that his trial lawyers did not provide him with objectively reasonable performance within the wide range of professionally competent assistance. See Strickland, 466 U.S. at 688, 104 S.Ct. at 2065. McNair argues that, in light of his confessions, "the only legitimate defense in this case would have been one based on intoxication. By not presenting such a defense in this case, trial counsel essentially presented no defense at all."[120] It cannot be unreasonable for a lawyer to choose against a particular strategy when there is little evidence to support it. McNair's lawyers were aware of the events of the crime—McNair's four confessions and the fact that he led Deputy Hatcher to Riley's purse the next day—that undermined a voluntary intoxication defense. Further, no specific evidence of the amount or timing of McNair's crack-cocaine use the night of the murder was ever introduced. It is not outside the bounds of reasonable, professional representation for a lawyer to choose not to pursue a strategy that he considers unfruitful based on the available evidence. Thus, the argument his counsel is now making is not that intoxication was the "only legitimate defense," but that, in hindsight, it may have been a better defense. As the Eleventh Circuit made clear in Chandler, it is not for this court to evaluate the performance of counsel, but only to determine that no reasonable lawyer would have failed to put on an intoxication defense in light of the facts of this case. 218 F.3d at 1315. In light of the evidence that McNair was not operating with a diminished mental capacity at the time of the murder, this court does not find that McNair's counsel's performance was objectively unreasonable.

## G. OUTBURSTS AND VICTIM CHARACTER TESTIMONY

McNair claims that the prosecutor's use of testimony about Riley's character and the repeated emotional outbursts by her family during the trial violated his right to a fair trial under the Sixth Amendment. This claim was considered and rejected by the Alabama Court of Criminal Appeals on direct review. McNair, 653 So.2d at 329–30. That court concluded, after a review of the trial transcript, that the events about which McNair complains were not sufficiently serious to constitute a violation of his constitutional rights. Because a state court adjudicated this claim on the merits, this court reviews it under the standard set out under § 2254(d). After a review of the record and the state court's decision, this court finds the state court was neither unreasonable in its interpretation of the facts or law, nor acting contrary to clearly established law when it denied McNair's claim; accordingly, no relief is due to him here.

McNair's argument is based on two, related happenings during the trial. First,

119. Id.

120. Pet'r Br. at 112.

the prosecutor made extensive use of Riley's family members to establish facts at the trial.[121] Riley's daughter, son, granddaughter, and daughter-in-law each testified, on matters ranging from the discovery of Riley's body and identification of articles belonging to her to identification of the murder weapon. This testimony was often graphic and redundant. In the course of developing this testimony, the prosecutor brought out many facts that served no purpose other than to establish the victim's character, such as her participation in church activities,[122] her relationship with other family members,[123] and the fact that she carried a book of verse and pictures of her grandchildren in her purse.[124] McNair's attorney objected, repeatedly, that much of this testimony was irrelevant.

Second, there were several emotional episodes by members of Riley's family in front of the jury. Family members broke down in tears, and, on at least two occasions, the prosecutor instructed his witness to "take a breath" and compose herself.[125] The prosecutor's closing statement was also interrupted—in part due to its inflammatory nature—by outbursts from family members.[126] These outbursts were significant enough to prompt the judge to intervene and suggest that some of the family members step outside the courtroom.[127] McNair's lawyer asked for a mistrial; instead, the judge gave the following instruction: "ladies and gentlemen, you should not allow either sympathy or prejudice or

anything other than the facts to be involved in your decision in this case."[128]

 McNair points to several Supreme Court cases for the proposition that the administration of justice should be free from extraneous control and influence, that is, factors outside the facts and law upon which a case is based. Generally, a defendant has the constitutional right to "be tried in an atmosphere undisturbed by" public passion, *Irvin v. Dowd*, 366 U.S. 717, 728, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751 (1961), or, in other words, "free from outside control and influence," *Cox v. Louisiana*, 379 U.S. 559, 562, 85 S.Ct. 476, 480, 13 L.Ed.2d 487 (1965). The prosecutor plays a pivotal role in protecting a defendant's rights, for as a "servant of the law. . . . It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger*, 295 U.S. at 88, 55 S.Ct. at 633.

 To be sure, it is clearly established that a criminal defendant's Sixth Amendment rights can be violated by the introduction of extraneous or inflammatory materials during a trial. That determination, though, is one based almost entirely on a review of the trial record. In other words, it is mostly a question of fact to which a trial court is entitled significant deference, especially on a habeas petition.

The evidence supports the state court's conclusion that the district attorney's use

---

**121.** Trial Tr. at 816–917.

**122.** *Id.* at 850–51.

**123.** *Id.* at 819–20.

**124.** *Id.* at 823–28, 875.

**125.** *Id.* at 821, 823, 824, 827, 854.

**126.** *Id.* at 1593.

**127.** *Id.*

**128.** *Id.* at 1593–94.

of family members as witnesses and their emotional episodes during the trial did not rise to the level of constitutional harm. The State articulated clear and valid reasons for calling these witnesses, be that to identify the weapon or identify the scene of the crime. The state court was persuaded by those justifications. None of the family-member witnesses was offered for the sole purpose of introducing unduly prejudicial evidence with no probative value. The state court, therefore, was reasonable in its conclusion that the questionable aspects of the testimony were incidental and excusable. Further, the state court found that the judge's instruction to the jury to "not allow either sympathy or prejudice or anything other than the facts to be involved in your decision in the case" was a proper guide for the jury. *Ex Parte McNair*, 653 So.2d at 329. Again, this is a reasonable conclusion in light of the absence of any other evidence indicating that the jury did anything but follow this instruction. All told, there are no clearly established bright-line rules in a claim of this sort and, therefore, nothing in the record demands reversal of the trial court's verdict.

## H. VENUE

 McNair's eighth claim charges that the trial court's denial of his motion to change the venue of the trial was a violation his rights under the Sixth Amendment. The right to a fair and impartial jury, free from the prejudicial influence of external factors like inflammatory publicity, has been clearly established. *Irvin*, 366 U.S. at 722, 81 S.Ct. at 1642. McNair contends that a saturation of adverse pretrial publicity in Henry County fostered strong prejudice against him among members of the community and prevented selection of an impartial jury. On direct appeal, the Alabama Court of Criminal Appeals affirmed the trial court's ruling. *McNair*, 653 So.2d at 324. This court finds that the decision of the Court of Criminal Appeals was neither contrary to, nor an unreasonable interpretation of, clearly established law; nor was it an unreasonable interpretation of the facts in light of the evidence. Accordingly, McNair is not entitled to relief under § 2254 for this claim.

 McNair argues that pretrial publicity was so inflammatory that it established a presumption of prejudice in the community.[129] To establish a presumption of prejudice, McNair must show two things: (1) that pretrial publicity was sufficiently prejudicial and inflammatory; and (2) that the prejudicial pretrial publicity saturated the community. *Coleman v. Kemp*, 778 F.2d 1487, 1490 (11th Cir.1985). That said, finding presumed prejudice is appropriate only in "extreme situations." *Id.; see also Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683 (1976) ("pretrial publicity even pervasive, adverse publicity

---

129. A challenge to the denial of a motion for a change of venue can be based on either actual or presumed prejudice of the jurors. *Mills v. Singletary*, 63 F.3d 999, 1009 (11th Cir.1995). To show actual prejudice, a petitioner must prove that " 'one or more jurors 'entertained an opinion before the trial' that [the defendant] was guilty and 'that these jurors could not put this prejudice aside and render a verdict based solely on the evidence

presented.' " *Id.* (quoting *United States v. De La Vega*, 913 F.2d 861, 864–65 (11th Cir. 1990)). McNair does not argue that any juror was actually prejudiced. Thirty-two prospective jurors were questioned during voir dire about the effect of pretrial publicity, and only two stated they had fixed opinions because of it. Both were challenged for cause by McNair and excluded from the venire. Trial Tr. at 546–53, 562–65.

does not inevitably lead to an unfair trial"). The parties do not contest, and the record amply reflects, that the community was saturated with news of Riley's murder, at least for the period of time directly following the event. The issue here is whether or not that publicity was so prejudicial that it established an "extreme situation" where a presumption of prejudice has been established.

The record consists of accounts of reports from two newspapers (the Dothan Eagle and Abbeville Herald), three radio stations (WKMX, WOOF, and WESP), and two television stations (WDHN and WTVY) about Riley's murder. The reports share certain characteristics. The murder was a lead story for each of these media outlets at the time it occurred, and the murder story was aired or printed multiple times over several days. Most outlets reported similar details of the crime as they became known: that Riley suffered multiple stab wounds to the neck; that the murder was allegedly committed in the course of a robbery; and that the perpetrator McNair had worked for Riley. McNair's confession to the police was also widely reported. Much of the information in these stories was apparently provided by the Henry County Sheriff's Department.

■ There is no doubt that many, often grisly, details of the murder were public knowledge by the time McNair's trial began. The Sixth Amendment does not require, though, that jurors be ignorant of the facts and issues involved in the case. *See Irvin,* 366 U.S. at 722, 81 S.Ct. at 1642.

The type of extreme situation that mandates a change of venue is generally characterized by reporting that arouses or incites the passion of the community, or expresses conclusions that are inflammatory and prejudicial to the defendant. *Compare Irvin,* 366 U.S. at 725–26, 81 S.Ct. at 1644 (finding change of venue warranted when newspaper articles about defendant and the crime were reported over the course of six to seven months, including the report of a promise made by the sheriff to "devote his life to securing petitioner's execution"), *and Coleman,* 778 F.2d at 1538–39 (finding change of venue warranted where law-enforcement official announced that the circumstantial evidence was "overpowering" and that there was "no point in looking for anybody else"; where the publicity was calculated to provoke or reflected an atmosphere of hostility; and where the reporting reflected that the community was predisposed as to both guilt and the sentence), *with Mills,* 63 F.3d at 1012 (finding no need for a change of venue where reporting "was essentially factual and was not directed at arousing or inciting the passion of the community") (internal quotations omitted). McNair has failed to demonstrate that he was constitutionally entitled to a change in venue because he has not presented evidence that these accounts reported anything other than facts.

■ On habeas-corpus review, it is not for this court to determine whether a change of venue should have been granted.[130] This court need only determine if the state court acted contrary to federal

---

130. McNair also argues that he was entitled to a change of venue because his co-defendant Olin Grimsley, who was tried separately, received a change of venue. While this argument could lend some weight to McNair's claim, the record does not support the conclusion that McNair draws. According to McNair, Grimsley "necessarily received no more publicity than Mr. McNair, given that the media reports were for the one crime, for

law or made an unreasonable determination of the facts or the law. Venue determinations are inherently factual. The record before this court, which is the record that was before the state courts, contains no evidence of news reporting beyond the facts of the case; there is also no evidence of inflamed community opinion. All told, the evidence supports the conclusion here that denial of a change of venue by the state court was reasonable and not contrary to federal law. Hence, reversing that decision by granting relief under § 2254 is not proper.

## I. IMPROPER ADMISSION OF STATEMENT TO POLICE

██ In his ninth claim, McNair contends one of his statements was given to police before he was advised of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), in violation of his Fifth Amendment privilege against self-incrimination. Although McNair gave multiple statements to the police, the only one he currently challenges is that taken by Deputy Rip Hatcher at the time of his arrest. As an initial matter, McNair suggests that no state court has adjudicated his *Miranda* claim and that this court should review it initially.[131] This view is not supported by the record. The state trial court did, in fact, conduct a

suppression hearing and decided to admit all of McNair's statements to the police.[132] This determination was made after the court heard the exact testimony that McNair relies upon now in support of his *Miranda* claim. The findings of the state trial court were "a determination of a factual issue made by a State court" and therefore, "shall be presumed to be correct." 28 U.S.C.A. § 2254(e)(1); *cf. Dugger,* 874 F.2d at 762 (finding a trial court's motion to suppress a confession is a factual determination afforded the presumption of correctness under pre-AEDPA § 2254(d)). Thus, this court reviews the state court's decision according to the standards of review set forth in § 2254(d).

██ The trial court's decision to admit McNair's confession is supported by the record, is not an unreasonable interpretation of the facts or law, and is not a decision contrary to clearly established federal law. During direct examination, Deputy Hatcher offered this account of McNair's arrest:

"Q: When you went to the door and knocked on the door, who came to the door?

"A: Mr. McNair.

"Q: And did you identify yourself?

"A: I did.

"Q: At point in time what was the statement you made to him.

which both were arrested and tried." Pet'r Br. at 135. There is no way to conclude that this is true. Grimsley's first trial, in Henry County, ended in a mistrial when the jury was unable to return a verdict. *Grimsley v. State,* 632 So.2d 547, 548 n. 1 (Ala.Crim.App.1993). He was subsequently retried in Montgomery County, convicted, and sentenced to life. Unlike McNair, Grimsley had already gone through trial when he was granted a venue change; McNair had not. As the procedural history of McNair's case confirms, sometimes a change in venue becomes appropriate only after the conclusion of prior proceedings.

For Grimsley, the venue change became appropriate after a mistrial; for McNair, the venue change became appropriate after his second sentencing. In any event, the relevant inquiry here is the reasonability of the state court's conclusion, and one judge's finding of fact in a related case is hardly dispositive.

**131.** Pet'r Br. at 140.

**132.** Trial Tr. at 763.

"A: I asked him—I told him I needed to talk to him.

"Q: Did you place him under arrest?

"A: I did.

"Q: All right, what did you place him under arrest for?

"A: Murder.

"Q: All right. And before you placed him under arrest for murder, though, did you question him in any manner or fashion of any of the specifics of the death and robbery of Ella Foy Riley?

"A: I asked him did he know anything that I needed to know. And he said no.

"Q: He said—I'm sorry—he said what?

"A: No.

"Q: All right. Then did you give him his rights?

"A: I did." [133]

McNair disputed this account of his arrest claiming that he was not read his rights until he was in the patrol car, after he made a statement to Hatcher in his yard.[134] McNair further testified Hatcher persuaded him to make a statement with promises of leniency.

"Q: Okay. Tell the Court then what happened between you and Rip Hatcher in your conversation. What did he do next?

"A: He told me that he already had— somebody already told him what all had happened. He already knew what all had happened. And he told me that if I tell him what happened, that he would make it all easy for me.

. . . .

"Q: Did he say what he'd do for you?

"A: He said he'd do all he could for me. He didn't go into detail. He just said he'd do it." [135]

■ When a court determines an alleged violation of a criminal defendant's *Miranda* rights, it must look to the totality of the circumstance surrounding the statement. *Dugger*, 874 F.2d at 761. And, where that determination requires the court to make findings of fact, it must determine the credibility of the witnesses before it. Although the above-quoted testimony of McNair and Hatcher conflicted, McNair also admitted on cross-examination that he told Agent Weekly in a subsequent interrogation that Hatcher had read him his *Miranda* rights before making his statement.[136] This exchange was captured on audio tape, the substance of which was confirmed by McNair at trial.[137] It was reasonable for the court to conclude that McNair's testimony, a year after his arrest, was inaccurate and possibly self-serving as well. In crediting the testimony of Hatcher over McNair, the trial court made a reasonable determination of the facts and a reasonable application of the law to those facts. No relief is due to be granted on this claim.

### J. IMPROPER TESTIMONY BY THE BAILIFF AT TRIAL

■ McNair's tenth claim attacks the propriety of testimony against him at trial by the court bailiff, Fred Deaton. Deaton's testimony was intended to establish

**133.** *Id.* at 713–14.

**134.** *Id.* at 664–65.

**135.** *Id.* at 663.

**136.** *Id.* at 691.

**137.** *Id.* at 705–06.

the chain of custody of a knife blade that was introduced into evidence. McNair argues generally that Deaton's testimony lent "credibility to his colleagues in law enforcement [and] created additional ·and more significant prejudice to Mr. McNair at trial."[138] In particular, he objects to the following exchange between Valeska and Deaton:

> "Q: Were you working under Sheriff Welcher on or about May the 22, 1990, when there was a homicide, a capital murder case, with Ella Foy Riley?
>
> "A: Yes."[139]

■ The Supreme Court has warned that association between key prosecution witnesses and jurors, like the relationship between a bailiff and jurors, can undermine the Sixth Amendment rights of a criminal defendant. *Turner v. Louisiana,* 379 U.S. 466, 474, 85 S.Ct. 546, 550, 13 L.Ed.2d 424 (1965). However, *"Turner* ... did not set down a rigid, *per se* rule automatically requiring the reversal of any conviction whenever any Government witness comes into any contact with the jury." *Gonzales v. Beto,* 405 U.S. 1052, 1054, 92 S.Ct. 1503, 1504–05, 31 L.Ed.2d 787 (1972) (Stewart, J., concurring in the judgment). The intensity and extent of the contact between a witness and jurors are two factors to be considered by the court in such a claim. *Id.* at 1056, 92 S.Ct. at 1505.

The Alabama Supreme Court denied relief on this claim, finding that Deaton's testimony "conveyed nothing more to the jury than that the bailiff was working for Sheriff Welcher when Ms. Riley was murdered and that he had participated in the

investigation of what ·was undisputedly a 'capital murder case.'" *Ex Parte McNair,* 653 So.2d at 359. This finding comports with clearly established law, was supported by the record, and should not be disturbed by this court. Deaton's affirmative answer to a question that included the phrase "capital murder case" was hardly a conclusion by him about the merits of the case drawn by a key prosecution witness; indeed, the particular question was primarily intended to·establish Deaton's employment at the time of the murder. Any possible risk of prejudice on this minor point was minimized by the jury instruction given by the trial judge that jurors should not give Deaton's testimony "any more strength than that of any other witness."[140] As the Alabama Supreme Court recognized, "a bailiff should never be put into the position of having to testify for the prosecution." *Ex Parte McNair,* 653 So.2d at 358. However, without a *per se* rule requiring reversal, a finding that error was not prejudicial is neither contrary to nor an unreasonable interpretation of federal law. Relief on this claim is denied.

## K. DEATH SENTENCE IMPOSED UNDER PATTERN OF RACIAL BIAS

McNair's eleventh claim challenges the constitutionality of his death sentence on the grounds that it was imposed pursuant to a pattern of racial bias in violation of his equal-protection rights under the Fourteenth Amendment. The State again argues this claim is procedurally barred. Although the United States Magistrate Judge found that McNair had not default-

---

138. Pet'r Br. at 142.

139. Trial Tr. at 920.

140. Id. at 918–19.

ed on it,[141] the State did not object to this recommendation,[142] and this court adopted all of the magistrate judge's recommendations to which there were no objections. *McNair,* 97 F.Supp.2d. at 1274. These recycled procedural arguments are still not meritorious.

■■■ Nonetheless, McNair has not established grounds for relief. Other infirmities of McNair's death sentence notwithstanding, there is simply no evidence that the penalty is invalid because it was imposed pursuant to a pattern of racial bias. McNair points to the purportedly discriminatory actions taken by the district attorney that he complains of elsewhere—discrimination in selection of the grand jury foreperson, the prosecutor's use of peremptory strikes, comments made by the prosecutor at trial, etc.—to conclude that the "death penalty was sought and imposed in this case, in part, because of the race and status of Mr. McNair and the victim."[143] As already discussed, these claims of discrimination are of no merit on their own; similarly, when put together, they do not show that McNair was sentenced to death because of his race.

■■■ The Supreme Court has made clear on several occasions that "[d]iscrimination on the basis of race, odious in all respects, is especially pernicious in the administration of justice." *Rose,* 443 U.S. at 555, 99 S.Ct. at 3000 (discussing the exclusion of African–Americans from grand jury service); *see also Turner v.*

*Murray,* 476 U.S. 28, 35, 106 S.Ct. 1683, 1688, 90 L.Ed.2d 27 (1986) (finding that an African–American defendant accused of killing a white man and facing the death penalty was entitled to question jurors on racial discrimination). However, "to prevail under the Equal Protection Clause, [a petitioner] must prove that the decisionmakers in his case acted with discriminatory purpose." *McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987) (emphasis omitted). McNair has presented no evidence to support his claim that the prosecutor's allegedly discriminatory acts infected the jury and the judge. He has not cited any statement or finding by a decisionmaker from which the court can even infer discriminatory purpose. No relief is due to be granted.

## L. UNCONSTITUTIONAL OVERRIDE OF THE JURY VERDICT OF LIFE IMPRISONMENT

Claim twelve challenges the constitutionality of the trial court's override of the second sentencing jury's verdict of life imprisonment without parole.[144] He claims that the override resulted in an arbitrary sentence, violating his constitutional rights to equal protection, due process, a fair trial, and reliable sentencing under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

McNair raised this claim on direct appeal, and the Alabama Supreme Court

---

**141.** Report and Recommendations, filed June 2, 1999 (doc. no. 40), at 21–22.

**142.** Objection, filed June 28, 1999 (doc. no. 43).

**143.** Pet'r Br. at 144.

**144.** Alabama law vests sentencing authority in the trial judge, who must consider an advi-

sory-jury verdict unless waived by both parties and approved by the court. 1975 Ala. Code § 13A–5–46. This scheme has been held constitutional by the Supreme Court. *Harris v. Alabama,* 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).

ruled generally that, after considering "the merits of all the issues raised by McNair ... the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence and that the death sentence was proper under the circumstances." *Ex Parte McNair*, 653 So.2d at 360–61. On collateral review, the Court of Criminal Appeals found that this earlier ruling addressed the override issue and, moreover, that the claim had no merit. *McNair*, 706 So.2d at 854.

McNair presently makes six specific objections to this override: (1) it was based on improper hearsay, improper victim-impact evidence, and improper sentencing recommendations from the community; (2) the trial court improperly found the crime to be "especially heinous, atrocious or cruel"; (3) there was insufficient evidence to support aggravating circumstances in this case; (4) the trial court was incorrect in finding that aggravating circumstances outweighed mitigating circumstances; (5) the trial court failed to consider and find the existence of mitigating circumstances presented at trial; and (6) judicial override as allowed under Alabama law is standardless and therefore unconstitutional.

■ Two initial matters must be resolved before reaching the merits. First, the State claims that McNair's "failure to object to the trial court's aggravating and mitigating circumstance findings prior to this Court's review weighs against his claim of prejudice and warrants review only for plain error."[145] Under Alabama law, the failure of a defendant to preserve an issue on appeal in a capital case does not foreclose review, but limits the reviewing court to searching the record for "plain

error." *See, e.g., Henderson v. State*, 583 So.2d 276, 284 (Ala.Crim.App.1990), *aff'd*, 583 So.2d 305 (Ala.1991). Respect for the decisions of state courts requires collateral federal review of a state court finding to be undertaken with a narrower standard of review than that used by the state court. *Davis v. Zant*, 36 F.3d 1538, 1545 n. 10 (11th Cir.1994). Accordingly, this court applies deferential review to the state court's plain-error review.

■ Second, the State claims that McNair did not raise the constitutionality of Alabama's sentencing scheme previously, and is, therefore, procedurally barred from raising it here. Regardless of its procedural posture, this claim can be rejected outright in light of *Harris v. Alabama*, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). Neither Alabama law nor Supreme Court precedent has changed since *Harris* upheld the constitutionality of Alabama's sentencing scheme. Therefore, to the extent McNair's argument rests on the proposition that Alabama's sentencing scheme, on its face, leads to arbitrary and unconstitutional results, he has not made out a claim for relief under either prong of § 2254(d).

McNair's five remaining arguments are all challenges to the evidentiary basis of the trial court's sentencing decision. A copy of that decision was submitted to the court as Exhibit A to the State's brief, and confirms that the state court's conclusions were neither unreasonable nor contrary to clearly established law.

McNair's first ground for relief—that his sentence was based on improper hearsay, improper victim-impact evidence, and improper sentencing recommendations from the community—is not accompanied

---

145. Resp't Br. at 101–02.

by citation to any part of the record, making it impossible for the court to determine the basis for his contention. Because the court does not know to what McNair is specifically objecting, it cannot address this claim.

■ The trial court concluded that two statutory aggravating circumstances had been proven beyond a reasonable doubt: (1) the murder was committed in the course of a robbery, 1975 Ala.Code § 13A–5–49(4); and (2) the crime was "especially heinous, atrocious or cruel," 1975 Ala.Code § 13A–5–49(8). McNair challenges this latter finding as contrary to *Maynard v. Cartwright*, 486 U.S. 356, 365, 108 S.Ct. 1853, 1860, 100 L.Ed.2d 372 (1988), which held a similar aggravating circumstance in Oklahoma's death-penalty statute unconstitutionally vague.[146] Alabama courts have consistently interpreted this factor as requiring a showing that the crime was "scienceless ... pitiless [or] unnecessarily torturous to the victim." *Ex Parte Kyzer*, 399 So.2d 330, 334 (Ala.1981). Testimony from a forensic pathologist at trial indicated that Riley suffered from two stab wounds to the throat, a large number of "cuts, knicks [sic], abrasions, and bruises" and that the killing took place after a protracted struggle, causing "severe pain over several minutes while she was being attacked and dying."[147] Evidence also showed that McNair knew Riley, that she had befriended him, and that he had done yard work for her. In light of this evi-

dence, this court cannot find that the trial court, or any state court on review, made an unreasonable determination of the facts or violated clearly established law.

The trial judge also found one statutory mitigating circumstance: the defendant did not have a significant history of prior criminal activity. 1975 Ala.Code § 13A–5–51(1). The court also found the following to be non-statutory mitigating circumstances:

"(8) The Defendant was born on November 18, 1964 and was reared in the Abbeville, Alabama area. His father died when he was very young and he is the oldest of seven children born to his mother. He was involved in sports at Abbeville High School until he was expelled for selling drugs upon the school grounds during his junior year in high school.

"(9) The Court finds ... the Defendant has been a cooperative prisoner and has caused no problems at the Henry County Jail."[148]

■ McNair argues that the trial court "failed to consider and find the existence of mitigation that was presented at trial," including testimony that McNair

"was a good employee for both of his previous employers, that he was cooperative when he was young, that he got into trouble only when he became involved in drugs, that he had voluntarily

---

**146.** If McNair is making a facial attack on the validity of this aggravating condition, his argument fails. Alabama's sentencing language has been narrowed through judicial interpretation as applying to only "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." *Ex Parte Kyzer*, 399 So.2d 330, 334 (Ala.1981). Since *Maynard*, the "heinous, atrocious or cruel" circumstance in the Alabama code,

read with this limitation, has continued to be applied validly in capital sentencing. *Haney v. State*, 603 So.2d 368, 387 (Ala.Crim.App. 1991), *aff'd*, 603 So.2d 412 (Ala.1992).

**147.** Resp't Br., Ex. A, at 2.

**148.** *Id.* at 5–6.

sought treatment for his drug addition [sic] and that he had been turned away because he was poor, that it was his drug dependency that lead [sic] to the crime, and that Deputy Hatcher had no trouble with Mr. McNair to the extent that it was unnecessary to handcuff him." [149]

McNair's argument is only half true.. The trial court explicitly did consider, but rejected, each of the points McNair raises now, except for his conclusory assertion that "his drug dependency lead [sic] to the crime." The Constitution requires that "a death penalty statute must not preclude consideration of relevant mitigating factors," *Lockett v. Ohio,* 438 U.S. 586, 608, 98 S.Ct. 2954, 2967, 57 L.Ed.2d 973 (1978), but not that the sentencer accept them. McNair has presented no evidence that the trial court did not fulfill its constitutional duty to consider each of the factors he raises in this writ. He has not made out grounds for relief.

McNair's remaining contention, that the trial court failed to weigh the aggravating and mitigating circumstances appropriately, falls short in light of this court's previous conclusions. McNair offers nothing other than argument to support this point. After finding that consideration in state court of the aggravating and mitigating factors was within the law, this court will not now conclude the trial court's ultimate weighing of those factors was clearly erroneous or unreasonable. *See Ford v. Strickland,* 696 F.2d 804, 819 (11th Cir.) (1983). Accordingly, none of the grounds raised by McNair in claim twelve of his petition can support relief from this court.

## M. CONSTITUTIONALITY OF THE ELECTRIC CHAIR

McNair's next ground for habeas-corpus relief attacks the constitutionality of Ala-

bama's method of execution. The electric chair was the mandatory method of execution at the time McNair filed his petition. This claim has since been mooted by 1975 Ala.Code § 15–18–82.1, which provides that death sentences in Alabama are to be carried out by lethal injection, "unless the person sentenced to death affirmatively elects to be executed by electrocution." Section 15–18–82.1 became effective on July 1, 2002, and it applies to all inmates currently on death row. *Gavin v. State of Alabama,* —— So.2d ——, ——, 2003 WL 22220950, at *60 (Ala.Crim.App. Sept.26, 2003).

## N. APPLICABILITY OF *RING V. ARIZONA*

In June 2002, the Supreme Court held in *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), that the rule of law stated in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), is applicable to capital defendants. In *Apprendi,* the Court found that the Sixth Amendment does not permit a defendant to be "expose[d] ... to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Apprendi,* 530 U.S. at 483, 120 S.Ct. at 2359; *Ring,* 536 U.S. at 589, 122 S.Ct. at 2432. In *Ring,* the Court held that "[c]apital defendants, no less than non-capital defendants ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. at 589, 122 S.Ct. at 2432. The Court in *Ring* thus overruled *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), "to the extent that it allow[ed] a sentencing judge, sitting without a jury, to find an aggrava-

---

149. Pet'r Br. at 146.

ting circumstance necessary for imposition of the death penalty." *Id.* at 609, 122 S.Ct. at 2443.

This case was pending at the time *Ring* was decided. Consequently, the court ordered the parties to file supplemental briefs addressing the decision in *Ring*. In his supplemental brief, McNair argued that his death sentence was imposed in violation of *Ring* because the trial judge, instead of the jury, found the existence of both aggravating factors and because the jury did not find that aggravating factors outweighed mitigating factors.

 McNair's contention that the rule of law in *Ring* invalidates Alabama's sentencing scheme and his own sentence is not the immediate question before the court. Rather, the court must first decide whether *Ring* may be retroactively applied to McNair's case. In general, "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Teague v. Lane,* 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989); *see also McCoy v. United States,* 266 F.3d 1245, 1255 (11th Cir.2001). If *Ring* is a new rule of criminal procedure under *Teague,* it may be applied retroactively to McNair's case only if it (1) "places certain kinds of primary private individual conduct beyond the power of the criminal law-making authority to prescribe" or (2) "requires the observance of those procedures that are implicit in the concept of ordered liberty." *Teague,* 489 U.S. at 311,

109 S.Ct. at 1075–76. Because the Eleventh Circuit has recently held that *Ring* may not be applied retroactively in the case of a habeas petitioner whose conviction became final in 1993, this court concludes that *Ring* may not be applied retroactively to McNair's claim. *Turner v. Crosby,* 339 F.3d 1247, 1283–86 (11th Cir. 2003).[150]

 The central question under *Teague* is whether *Ring* is a "new rule of criminal procedure," an inquiry that involves two parts. First, the court must determine whether *Ring* announced a "rule of criminal procedure." *See Turner,* 339 F.3d at 1247; *cf. Bousley v. United States,* 523 U.S. 614, 620, 118 S.Ct. 1604, 1610, 140 L.Ed.2d 828 (1998) (*Teague* bar does not apply to new *substantive* rules of criminal law). Like *Apprendi, Ring* "constitutes a procedural rule because it dictates what fact-finding procedure must be employed in a capital-sentencing hearing" and changes "neither the underlying conduct the state must prove to establish [that] a defendant's crime warrants death nor the state's burden of proof." *Turner,* 339 F.3d at 1284.

 Second, the court must decide if *Ring* announced a new rule. Under *Teague,* "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government ... [or] if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." 489 U.S. at 301, 109 S.Ct. at 1070; *see also*

---

**150.** This court is aware that the issue of *Ring's* retroactive application will be argued before the United States Supreme Court on April 19, 2004. *Summerlin v. Stewart,* 341 F.3d 1082 (9th Cir.) (en banc), *cert. granted, Schriro v. Summerlin,* —— U.S. ——, 124 S.Ct.

833, 157 L.Ed.2d 692 (2003) (No. 03–526). This court is, however, bound by current Eleventh Circuit precedent. *Nelson v. Campbell,* 286 F.Supp.2d 1321, 1326 (M.D.Ala.) (Thompson, J.), *aff'd,* 347 F.3d 910 (11th Cir. 2003), *rev'd on other grounds,* —— U.S. ——,

*McCoy,* 266 F.3d at 1256. To apply this rule, the court must "ascertain the date on which [McNair's] conviction and sentence became final" and "survey the legal landscape as it then existed and determine whether a state court considering [McNair's] claim at the time ... would have felt compelled by existing precedent to conclude that the rule [in *Ring*] was required by the Constitution." *Caspari v. Bohlen,* 510 U.S. 383, 390, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994). In *Turner,* the Eleventh Circuit held that in 1993—the year the petitioner's conviction became final—the outcome in *Ring* was not "compelled by existing precedent" because *Walton*—decided in 1990—expressly upheld the Arizona sentencing scheme struck down in *Ring.* 339 F.3d at 1284–85. The same is true in this case. When McNair's conviction became final in 1995, *Walton* was the law and *Apprendi*—the case on which *Ring* is premised—would not be decided for another five years. Thus, as to McNair, *Ring* announced a new rule of criminal procedure.[151]

Given that *Ring* is a new rule, the court must now ascertain whether it falls within one of the two exceptions to the general rule of non-retroactivity announced in *Teague.* In *Turner,* the Eleventh Circuit

held that neither exception applies. First, the court wrote that, "Similar to *Apprendi, Ring* 'does not decriminalize any class of conduct or prohibit a certain category of punishment for a class of defendants.'" 339 F.3d at 1285 (quoting *McCoy,* 266 F.3d at 1256–57). The court also concluded "that *Ring,* like *Apprendi,* 'is not sufficiently fundamental to fall within *Teague's* second exception.'" *Id.* (quoting *McCoy,* 266 F.3d at 1257). *Turner* forecloses the need for further discussion; McNair's *Ring* claim is barred by *Teague.*

## IV. CONCLUSION

For the reasons explained above, McNair's petition for habeas-corpus relief is due to be granted only on his claim of ineffective assistance of counsel in the penalty phase of trial. An appropriate judgment will be entered.

## JUDGMENT

In accordance with the memorandum opinion entered today, it is the ORDER, JUDGMENT, and DECREE of the court that petitioner Willie McNair's petition for writ of habeas corpus, filed on August 18, 1998 (doc. no. 1), is granted to the following extent:

124 S.Ct. 835, 157 L.Ed.2d 692 (2003) (No. 03–6821).

**151.** It is worth pointing out that, for some petitioners, *Ring* is arguably not a new constitutional rule of criminal procedure. Imagine a hypothetical habeas petitioner whose conviction became final between the time when the Supreme Court decided *Apprendi* and the time it decided *Ring.* In reaching its decision in *Ring,* the Court stated that finding the Arizona death-penalty sentencing scheme constitutional would reduce *Apprendi* to a "meaningless and formalistic rule of statutory drafting." 536 U.S. at 604, 122 S.Ct. at 2441. This language implies that the outcome in *Ring* was dictated by *Apprendi.* Therefore,

our hypothetical petitioner could arguably rely on *Ring* because it was dictated by *Apprendi,* "precedent existing at the time [the petitioner's] conviction became final," *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070.

At the same time, however, there is a good argument that even for our hypothetical petitioner, *Ring* would still be considered a new rule. The Supreme Court has written that "there can be no dispute that a decision announces a new rule if it expressly overrules a prior decision." *Graham v. Collins,* 506 U.S. 461, 467, 113 S.Ct. 892, 897, 122 L.Ed.2d 260 (1993). On this reasoning, *Ring* is new for purposes of *Teague* because it overruled *Walton,* notwithstanding that *Ring* appears to be an application of *Apprendi.*

(1) The sentence of petitioner McNair is vacated.

(2) The State of Alabama has 90 days from the date of this judgment to resentence petitioner McNair.

It is further ORDERED that costs are taxed against respondent Donal Campbell, for which execution may issue.

The clerk of this court is DIRECTED to enter this document on the civil docket as a final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure.